EDWARD TORRES, ET AL.,[1] PETITIONERS v. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 18857-80, 18860-80,    Filed March 30, 1987.
18861-80, 12683-81,
19884-81, 3369-82,
3370-82, 328-83,
20469-83.

*Steven S. Brown* and *Harvey M. Silets*, for the petitioner
in docket No. 18857-80.

*George N. Larsen*, for the petitioners in docket Nos.
18860-80, 18861-80, 3370-82, 20469-83.

*Leslie S. Klinger*, for the petitioners in docket No.
12683-81.

*Edwin H. Baker*, for the petitioners in docket No.
3369-82.

*John M. Elias, Brian S. Masumoto, Frank M. Lavadera,*
and *Ralph A. Eppensteiner*, for the respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Peter Trust 1A for Jane
Thomas, Jerome D. Mack, Trustee, docket No. 18860-80; Center Trust, Jerome D. Mack,
Trustee, docket No. 18861-80; Michael Douglas and Diandra Douglas, docket No. 12683-81;
Henry Levine and Margaret M. Levine, docket No. 19884-81; Estate of David Brady,
Deceased, C. Leonard Gordon, Joan Silber Brady, and Margot Brady Gordon, Executors and
Joan Brady, Surviving Spouse, docket No. 3369-82; Harvey L. Silbert and Lillian Silbert,
docket No. 3370-82; Henry W. Dodge, Jr., and Lady Rachel Dodge, docket No. 328-83; Barbara
Goldman, docket No. 20469-83.

CLAPP, *Judge*: These consolidated cases initially involved issues relating to three limited partnerships: Regency Associates, Bari Associates, and Pallas Associates. The issues relating to Pallas Associates were conceded by petitioners and the parties have agreed to be bound by our decision in *Coleman v. Commissioner*, docket No. 12336-80, with respect to the issues relating to Bari Associates. Petitioner Edward Torres is the only petitioner with an interest in Regency Associates and is, therefore, the only petitioner to which the issues discussed herein relate. For purposes of conveinence, we will hereafter use "petitioner" as referring only to petitioner Edward Torres.

Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1974 | $1,896,912 |
| 1975 | 2,080,447 |

The issues for decision are:

(1) Whether the transaction by which Regency Associates acquired the subject property was so devoid of economic substance that the transaction should not be given effect for Federal tax purposes;

(2) Whether Regency Associates acquired sufficient benefits and burdens of ownership to be considered the owner of the subject property for Federal tax purposes;

(3) Whether Regency Associates entered into the subject transaction with a bona fide intent to make a profit independent of tax considerations; and

(4) If any depreciation is allowable to Regency Associates for the equipment purchased in the transaction in question, whether the half-year convention of section 1.167(a)-11(c)(2)(iii), Income Tax Regs., should be applied on the basis of a short taxable year for the year in which Regency Associates first engaged in its rental activity.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Las

Vegas, Nevada, at the time of the filing of his petition herein.

Petitioner has been in the business of owning and operating hotels for approximately 35 years, as well as investing in other business enterprises. David Hurwitz (Hurwitz), of the law firm of Marshall, Bratter, Greene, Allison & Tucker (Marshall Bratter), began representing petitioner in 1973. In May 1975, Hurwitz left Marshall Bratter to form, with several other partners, the law firm of Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov (Gordon Hurwitz). Hurwitz continued to represent petitioner as his personal attorney after leaving Marshall Bratter.

## Regency

Regency Associates (Regency) is a limited partnership which was organized under the laws of the State of Connecticut in December 1973. Hurwitz was the original general partner of Regency, and C. Martin Goldenberg (Goldenberg) was the sole original limited partner. Goldenberg is an attorney licensed to practice law in the State of New York. At the time of the transaction in question, Goldenberg was associated with Marshall Bratter. Goldenberg subsequently left Marshall Bratter to join Gordon Hurwitz.

Petitioner became the sole general partner of Regency pursuant to an amendment to the partnership agreement dated November 11, 1974. By the same amendment, four limited partners were added to Regency: (1) Rick Ovadia Torres Trust (ROT TRUST); (2) Brad Edward Torres Trust (BET TRUST); (3) Dara Grace Torres Trust (DGT TRUST); and (4) Lara Allegra Torres Trust (LAT TRUST). Petitioner was trustee of each of the four trusts. Under the terms of the amendment to the partnership agreement, profits would be allocated 50 percent to the general partner and 50 percent to the limited partners, in proportion to their respective capital contributions, and losses would be allocated 99 percent to the general partner and 1 percent to the limited partners, in proportion to their respective capital contributions. With the addition of petitioner as general partner and the four trusts as limited partners, Hurwitz became a limited partner of Regency with a nominal interest and

Goldenberg remained a limited partner, also with a nominal interest.[2]

Petitioner's contribution to the partnership capital was $657,500, while the contribution of each of the four trusts was $164,375. The capital contributions of petitioner and the four trusts were borrowed from the Valley Bank of Nevada (Valley Bank). The capital was borrowed pursuant to demand notes in the names of petitioner, RAT TRUST, BET TRUST, DGT TRUST, and LAT TRUST, dated November 13, 1974. The interest rate on each of the notes was 1 percent over the prime rate charged by the Bank of America, and the demand date on each of the notes was June 30, 1977. The loans to each of the four trusts were guaranteed by petitioner. The beneficiaries of the four trusts are petitioner's children.

Regency's 1974 partnership return shows that at the beginning of 1974, Regency had no assets and no liabilities. The return shows that at the end of 1974, Regency's only assets were the equipment it ·acquired in the transaction here in issue and $200 in "capital contribution receivables" from Hurwitz and Goldenberg, and that Regency's only liability was that which it incurred upon entering the transaction here in issue. Since its inception, Regency has been involved in no commercial activity other than its involvement with the transaction which is the subject of this case.

## Copylease

Copylease Corp. of America (Copylease) was, in 1974, a wholly owned subsidiary of Alanthus Corp. (Alanthus). Alan Shalov was chairman, president, and chief executive officer of Alanthus in 1974. When it acquired Copylease in 1973, Alanthus was principally engaged in the business of third-party leasing of IBM mainframe computers. Alanthus had historically involved itself in "agency leasing transactions,"[3] i.e., transactions in which it arranged and administered equipment leases for outside investors. However, in 1972,

---

[2]Hurwitz and Goldenberg had interests in Regency of approximately 0.00011 percent according to Regency's 1974 partnership return. Their capital contributions to the partnership were each approximately 0.0076 percent of the total contributions to the capital of Regency.

[3]See *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985).

Alanthus announced a program by which it intended to de-emphasize its agency leasing program.

During the fiscal year ended August 31, 1974, Alanthus received $2,916,000 from sale leaseback transactions with third-party investors on equipment with an undepreciated cost of $31,806,000 when sold. Alanthus continued to carry the equipment and related balances on its accounts.

Copylease was principally engaged in leasing Xerox and IBM photocopying equipment to end-users. Copylease would purchase equipment from the manufacturer only after a lease commitment had been obtained from an end-user. Copylease would typically lease the photocopiers to end-users on relatively short-term leases which averaged 26 months.

A standard end-user lease between Copylease and a third-party lessee of a Xerox 7000 would be for a period of 3 years, at a rental rate of $1,250 per month, plus an excess copy charge of $0.005 per copy for each copy in excess of the base volume of 40,000 copies. Under the terms of such a lease, Copylease was to enter into a full-service maintenance agreement with Xerox, at its own cost, to provide for Xerox to maintain the leased equipment. Copylease assumed all responsibility for loss or damage to equipment installed on the lessee's premises, except for loss or damage caused by the negligent or purposeful acts of the lessee, its agents, or employees. Copylease's initial service contracts with Xerox ran on average for 5 years and 3 months from the date of installation of each piece of equipment.

Copylease would attempt to re-lease its equipment until its investment was recovered and it had earned at least its desired return on investment. As of August 31, 1974, the aggregate purchase price of IBM and Xerox equipment that Copylease had under lease, including equipment not yet installed, was $12,536,957. Copylease had earned rentals of $3,179,045 on such equipment, and another $10,088,574 of rentals (based on the minimum monthly rental) were payable after that date, assuming no early terminations by the lessees. If all lessees who had early termination rights exercised them at the earliest opportunity, Copylease would have been entitled to receive, after August 31, 1974, at

least $7,876,709, based upon minimum monthly rental and termination fees.

As of August 31, 1974, Copylease's equipment under lease had a book value, cost less accumulated depreciation, of $9,049,531. As of that date, Copylease was obligated to purchase $2,300,000 of photocopy equipment for which leases had been obtained.

In its consolidated financial statement for August 31, 1974, Copylease reported as a "subsequent event" the receipt in November 1974, of $1,200,000 from a sale leaseback transaction with a third-party investor, involving photocopy equipment with an aggregate undepreciated cost when sold of $9,100,000. For its fiscal year ended August 31, 1974, Copylease had net earnings of $407,640 on gross revenues of $3,103,768. During that fiscal year, Copylease had revenues from equipment rentals of $2,631,926 and excess copy income of $260,096.

Copylease depreciated its photocopying equipment over 7 years using the straight-line method to a 5-percent salvage value.

## Curtis

Curtis Equipment Corp. (Curtis) was established in 1973 to engage in equipment transactions. Curtis was the wholly owned subsidiary of the Curtis Publishing Co., with which it filed a consolidated tax return in 1974. Curtis Publishing Co. had experienced considerable financial hardship in the late 1960's and early 1970's and reported a loss on its 1974 consolidated return.

## Structuring the Transaction

Prior to 1975, Barry Shalov was a partner in the law firm of Austrian, Lance & Stewart, P.C. Barry Shalov represented Copylease in the transaction in issue including the negotiations. Barry Shalov is Alan Shalov's brother and was one of the founding partners of Gordon Hurwitz in May of 1975.

The opportunity to enter the transaction was brought to Hurwitz' attention in September or October of 1974. In his first contact, Hurwitz was told that Alan Shalov was

interested in selling more than 50 percent of Copylease's portfolio for approximately $10 million. Hurwitz then contacted Alan Shalov to discuss the current financial condition of Alanthus. Hurwitz discussed the proposal with Alan Shalov in telephone conversations, as well as in face to face meetings at Alanthus' corporate headquarters in Connecticut.

During the course of these conversations, Hurwitz learned that Copylease needed money currently and was willing to quickly enter a transaction involving the sale of a substantial portion of its portfolio. Alan Shalov informed Hurwitz that he was willing to sell more than half of Copylease's portfolio, with a fair market value of roughly $10 million, in a deal requiring $2 million in cash.

Hurwitz discussed the proposal with David Shuldiner (Shuldiner), an independent consultant with whom he had contact at Marshall Bratter. Shuldiner had been retained on occasion by Drexel, Burnham, Lambert & Co. as a consultant regarding equipment leasing transactions. Shuldiner, to Hurwitz' knowledge, had no particular expertise regarding photocopying or Xerox equipment. Hurwitz also discussed the transaction with Herbert L. Getzler (Getzler), the president of Copylease.

At the request of Alan Shalov, Getzler prepared a cash-flow analysis reflecting income and costs with respect to the proposed transaction. Getzler's projections showed revenues to be generated by the equipment, costs required to sustain the revenue stream, and the resultant cash-flow. Getzler's cash-flow analysis reflected a recovery in less than 3 years of the investor's initial cash investment plus a relatively low interest factor.

Getzler met with Hurwitz to present and explain the cash-flow analysis and to explain the nature of the equipment-leasing industry and the status of Copylease's lessees. After securing petitioner's approval, Hurwitz negotiated the downpayment but not the purchase price of the equipment. Hurwitz believed that Copylease was seeking a 20-percent downpayment because that was the percentage that Copylease had put down when it purchased the equipment originally. Following negotiations and several

counteroffers, the parties agreed on a downpayment of $1,200,000.

Based on Xerox price lists, representations made by Copylease, and information provided by Shuldiner, Hurwitz ascertained that $10,100,000 was a fair price for the equipment. Hurwitz negotiated for an agreement by which petitioner would receive the first $1,632,000, less an amount to be paid to Copylease, generated by the subject equipment. The amount to be paid to Copylease was reflected in the transactional documents as a percentage of net cash-flow.

## The Transaction

Pursuant to the terms of a purchase agreement (agreement) dated November 11, 1974, Copylease sold to Curtis, for $10 million, the following equipment:

| Number | Type of equipment |
| --- | --- |
| 5 | Xerox model 660 |
| 135 | Xerox model 2400 |
| 37 | Xerox model 3600-I |
| 5 | Xerox model 3600-III |
| 137 | Xerox model 7000 |
| 8 | IBM copier I |
| 14 | IBM copier II |
| 5 | Saxon PPC-I photocopiers |
| 1 | A.B. Dick offset printing press |

Curtis paid the purchase price by means of a $1,200,000 cash downpayment and a non-negotiable, nonrecourse note (Curtis note) in the amount of $8,800,000.

The Curtis note required 180-monthly payments of $137,954 from Curtis to Copylease for the 180 month period beginning on January 31, 1975, and ending on December 31, 1989. The note was secured under a security agreement (Curtis security agreement) dated November 11, 1974. The rights and remedies of Copylease for payment, performance, and observance by Curtis of all its obligations were limited to and governed by the provisions of the Curtis security agreement. In the case of a failure by Curtis to make required payments due under the note in excess of the first $100,000 of principal, the Curtis security agreement pro-

vided that Copylease could look only to the equipment for recourse.

As of September 5, 1974, Chemical Bank had liens on the non-IBM equipment totaling $4,768,000 plus interest, and IBM had liens on the IBM equipment totaling $331,000 plus interest. Under the terms of the agreement, Curtis agreed that its interest in the subject machines was subordinate to that of Chemical Bank and IBM. Curtis acquired the equipment subject to the liens, but did not assume any obligations under those liens. Copylease was required to discharge the liens when they became due.

At the time of the transaction, the equipment was subject to end-user leases between Copylease and various third parties. These leases varied in length from 3 to 60 months. The Xerox 2400, 3600, and 7000 equipment was subject to end-user leases with varying lengths of 3 to 42 months. Copylease represented that, on the date of the transaction, an end-user lease for each piece of equipment was in full force and effect, and that the equipment was covered by a maintenance agreement between Copylease and Xerox or IBM, which was also in full force and effect.

Simultaneously with the execution of the agreement, Curtis and Copylease executed an agreement of lease (lease) by which Curtis leased back to Copylease the equipment that was the subject of the agreement. The term of the lease ran from November 11, 1974, through and including December 31, 1989 (lease term). Under the terms of the lease, Copylease was required to pay Curtis "fixed rent" of $137,954 plus $20,833 per month from January 31, 1975, through December 31, 1989. The monthly payment in excess of $137,954 was payable only from a "net cash-flow account," and could be deferred until there were sufficient funds in the account with which to make the payment. The lease provided for deferral to the extent that the monthly fixed rental payment exceeded the net credit balance in the account as of the end of the immediately preceding month. The net cash-flow account is an account which would be credited on the last day of each month for all rents received on the equipment and debited for all expenses relating to the equipment. As of the first day of each month, the account was to be debited with the net credit balance in the

account as of the last day of the preceding month. The net cash-flow was defined as the sum of all revenues received less all expenses accrued with respect to the equipment in each month.

The lease also provided for the payment of "additional rent" beginning in January 1976, by Copylease to Curtis in the amount of 52 percent of the net credit balance in the net cash-flow account at the end of the preceding month after deducting from such balance the fixed rent plus any deferrals, until such time as the additional rent and the fixed rent in excess of $137,954 per month (aggregately referred to as "contingent rent") paid to Curtis aggregated $1,632,000. After the total contingent rent paid had reached this amount, the additional rent would decrease to 23.7 percent of the net credit balance in the net cash-flow account as of the end of the immediately preceding month after deducting from such balance an amount equal to 421.94 percent of the fixed rent in excess of $137,954 per month paid from the net cash-flow account.[4] This amount would be payable for the remainder of the lease.

All rent payments from Copylease to Curtis would be made after payment of all expenses directly relating to the equipment. Such expenses were defined to include maintenance, insurance, repairs, and salesmen's commissions, as well as principal and interest on the Chemical Bank loans. Overhead and general or administrative expenses of Copylease were excluded.

Copylease agreed to maintain each item of equipment in good working order so long as it was economically practicable to do so, and to repair and pay all costs, expenses, fees, and charges incurred in connection with maintaining the equipment and with the use, possession, and operation of the equipment during the term of the lease. This obligation was defined as including repairs, maintenance, storage, and servicing of the equipment. Copylease also agreed, at its own expense, to insure the equipment at its full, insurable value.

---

[4] The effect of this provision was to entitle Curtis to payments from the net cash-flow account equal to the greater of either the $20,833 fixed rent amount or 23.7 percent of the net credit balance in the net cash-flow account for the preceding month.

Under the terms of the lease, Copylease could transport the equipment to any location it saw fit. If certain conditions were satisfied, Copylease could also dispose of any part of the equipment and simultaneously substitute an equal number of like-kind photocopiers. The conditions which had to be satisfied were: (1) Copylease was required to give 30 days written notice before making any substitutions; (2) any substitution equipment had to be free of all liens, leases, claims, and encumbrances, other than those that the substituted equipment had been subject to; (3) the substitution equipment could not be subject to debts that were either greater in amount, or that called for a payment schedule requiring payments later than those on the substituted equipment; and (4) as of the date of transfer, the substitution equipment had to have a fair market value and fair rental value not less than the same values for the substituted equipment.

The terms of the lease allowed Copylease to enter into subleases of the equipment, including subleases which extended beyond the lease term. Copylease was also allowed to offset against rent any amount due from Curtis with respect to the equipment, except that it could not offset payments due under the note from Curtis against rent, other than the fixed rent of $137,954.

The lease granted Copylease the right to purchase upon expiration of the lease, all of the equipment for a price equal to the sum of (1) the fair market value of the equipment, plus (2) the difference between (i) $5,315,000 and (ii) the total of all contingent rent paid by Copylease to Curtis during the term of the lease.

Copylease agreed to hold harmless and indemnify Curtis against any loss, cost, damage, or expense for any claim arising during the lease term connected with the delivery, warehousing, transportation, use, condition, possession, or removal of the equipment.

By a guarantee (Guarantee) dated November 11, 1974, Alanthus agreed to guarantee Copylease's obligations of payment and performance under the agreement, lease, and security agreement. At the same time that the other transactional documents were executed, Copylease and Curtis executed a bill of sale dated November 11, 1974.

## Curtis' Sale and Assignment to Regency

Simultaneously with the execution of the agreements between Curtis and Copylease, Curtis executed with Regency a purchase agreement and assignment (assignment) dated November 11, 1974, by which Curtis sold the equipment and assigned its rights under the lease to Regency in exchange for $10,100,000. Regency made its payment to Curtis by means of $115,000 in cash and a non-negotiable, nonrecourse note (Regency note) in the amount of $9,985,000. In accordance with the terms of the Regency note, Regency also paid at closing $1,200,000, as a prepayment of the interest that would otherwise accrue on the note during the year 1975.

The Regency note was for a term of 180 months, commencing January 31, 1975, and ending on December 31, 1989, and provides for 180 monthly payments of $137,954. The Regency note requires payments of principal and interest, including the prepayment, over its duration as follows:

| Year | Interest | Principal | Principal balance |
|------|----------|-----------|-------------------|
| 1974 | $1,200,000 | - - - | $9,985,000 |
| 1975 | 1,486,444 | $169,004 | 9,815,996 |
| 1976 | 1,459,275 | 196,173 | 9,619,823 |
| 1977 | 1,427,739 | 227,709 | 9,392,114 |
| 1978 | 1,391,133 | 264,315 | 9,127,799 |
| 1979 | 1,348,643 | 306,805 | 8,820,994 |
| 1980 | 1,299,326 | 356,122 | 8,464,872 |
| 1981 | 1,242,075 | 413,373 | 8,051,499 |
| 1982 | 1,175,625 | 479,823 | 7,571,676 |
| 1983 | 1,098,493 | 556,955 | 7,014,721 |
| 1984 | 1,008,958 | 646,490 | 6,368,231 |
| 1985 | 905,033 | 750,415 | 5,617,816 |
| 1986 | 784,399 | 871,049 | 4,746,767 |
| 1987 | 219,389 | 1,436,059 | 3,310,708 |
| 1988 | - - - | 1,655,448 | 1,655,260 |
| 1989 | - - - | 1,655,448 | - - - |

The Regency note allowed Regency to defer payments of principal and interest to the extent that rental payments from Copylease were not made when due. The note was secured by a security agreement (Regency security agreement), dated November 11, 1974. The rights and remedies of Curtis for payment, performance, and observance by

Regency of all its obligations were governed by the provisions of the Regency security agreement.

Regency, Curtis, and Copylease executed an assumption agreement (assumption), dated November 11, 1974, by which Regency agreed to assume all the obligations, duties, and liabilities of Curtis under the lease as if it had executed the lease. Regency also agreed that its interests in the equipment, the lease, and all underlying leases between Copylease and end-users were subject and subordinate to Copylease's security interest under the Curtis security agreement, all other security interests in the equipment, and Curtis' security interest under the Regency security agreement.

Notwithstanding any of the dates shown on the documentation, the entire transaction between Copylease, Curtis, and Regency was consumated on November 13, 1974.

### Participation Estimates

Alan Shalov included a memorandum to his files, dated November 12, 1974, regarding the "Copylease Tax Shelter." Alan Shalov's understanding of the transaction, as stated in the memorandum, was that Alanthus would sell to petitioner $10,124,000 worth of photocopying equipment installed on August 31, 1974, and then Copylease would immediately lease the equipment back from petitioner for 15 years. The memorandum stated that, in return, petitioner was entitled to rental payments entirely contingent on the net cash-flow generated by the equipment. Net cash-flow was stated to be the difference between the sum of rental and excess copy revenues and the sum of debt service and direct expenses.

According to the memorandum, petitioner was to receive the first $20,833 per month for the first 12 months; thereafter the first $20,833 of the net cash-flow plus the excess, if any, over $20,833 until the investor has recovered a total of $1,632,000; and thereafter the greater of the first $20,833 or 27.3 percent[5] of the net cash-flow. The memorandum stated that Copylease estimated a net cash-flow over the first 7 years of the lease totaling $19,279,000, and that

---

[5]This figure may have been a typographical error. The figure actually used in the transaction was 23.7 percent.

the investor would, therefore, receive approximately 29 percent of the cash-flow while Copylease would receive 71 percent. The memorandum also stated that the payout of $1,632,000 to the investor should take approximately 28 to 30 months from the commencement of the lease.

A cash-flow projection, dated February 27, 1975, was prepared by Andrew Kitson (Kitson), the comptroller of Copylease. This report projected cash-flow for the 2-month period ending February 28, 1975, and then quarterly for May 1975 through February 1981, a 74-month period. The report projected revenues, expenses, and net cash-flow from the equipment as follows:

| Quarter ended | Revenues | Expenses | Net cash-flow |
|---|---|---|---|
| 02/28/75[6] | $775,058 | $677,419 | $97,639 |
| 05/31/75 | 1,162,587 | 916,059 | 246,528 |
| 08/31/75 | 1,162,587 | 863,713 | 298,874 |
| 11/30/75 | 1,162,587 | 842,104 | 319,983 |
| 02/29/76 | 1,162,587 | 818,109 | 344,478 |
| 05/31/76 | 1,162,587 | 796,864 | 365,723 |
| 08/31/76 | 1,162,587 | 772,479 | 390,108 |
| 11/30/76 | 1,162,587 | 758,001 | 404,586 |
| 02/28/77 | 1,162,587 | 702,797 | 459,790 |
| 05/31/77 | 1,162,587 | 634,454 | 529,133 |
| 08/31/77 | 1,162,587 | 615,676 | 546,911 |
| 11/30/77 | 871,940 | 565,716 | 306,224 |
| 02/28/78 | 871,940 | 459,136 | 412,804 |
| 05/31/78 | 871,940 | 364,213 | 507,727 |
| 08/31/78 | 871,940 | 331,125 | 540,815 |
| 11/30/78 | 871,940 | 327,028 | 544,912 |
| 02/28/79 | 871,940 | 327,028 | 544,912 |
| 05/31/79 | 871,940 | 327,028 | 544,912 |
| 08/31/79 | 871,940 | 327,028 | 544,912 |
| 11/30/79 | 871,940 | 326,771 | 545,169 |
| 02/29/80 | 871,940 | 326,771 | 545,169 |
| 05/31/80 | 871,940 | 326,771 | 545,169 |
| 08/31/80 | 871,940 | 326,771 | 545,169 |
| 11/30/80 | 871,940 | 326,594 | 545,346 |
| 02/28/81 | 871,940 | 326,594 | 545,346 |
| | | | 11,221,339 |

Kitson's cash-flow analysis included estimates relating to Regency's participation in the net cash-flow estimated therein. The assumptions regarding the formula for determining the payments to be made to Regency from net

---

[6]The figures shown for the period ended 2/28/75 were for the 2 months preceding that date.

cash-flow are consistent with those stated in the agreements as executed. Kitson's cash-flow analysis estimated that Regency's participation in net cash-flow over the 74-month period covered therein would total $3,472,421 and estimated that Regency would receive $1,632,000 in payments within 29 months. Kitson estimated that Regency would receive contingent rent payments as follows:

| Year | Contingent rent[7] |
|---|---|
| 1975 | $250,000 |
| 1976 | 922,535 |
| 1977 | 694,237 |
| 1978 | 485,908 |
| 1979 | 516,657 |
| 1980 | 516,876 |
| 1981 | [8]86,208 |

### Fair Market Value and Residual Value

Fair market value and residual value appraisals were prepared by Robert Lew (Lew), of Jerry Silverman Associates, and made available to Hurwitz near the time of closing. The appraisals are dated November 11, 1974. During 1974, Lew was employed full time as a consultant to Time, Inc., in communications and data communications, and part time by Jerry Silverman Associates.

Lew determined the fair market value of the subject equipment by contacting used equipment dealers and reviewing publications which listed marketplace prices. Lew determined the residual value of the equipment by talking to the same people, soliciting their views as to what equipment values would be 15 years down the road, and using his own judgment.

Lew's fair market value appraisal estimated the fair market value of the equipment to be at least $10,200,000. Lew's residual value appraisal determined that the residual value of the equipment 15 years from the date of the appraisal would be at least $1,025,000. The residual value appraisal also estimated that the remaining useful life of the

---

[7]These figures are calculated by allocating quarterly estimates of "additional rent" on pro rata basis to each month within such quarter for months after Dec. 31, 1975, the date following which payments of additional rent were to commence.

[8]The figure for contingent rent in 1981 includes only payments of contingent rent expected for the first 2 months of 1981.

equipment at the date of the appraisal was at least 17 to 18 years.

## Returns and Results

During the years in issue, Regency's partnership returns, Forms 1065, showed the following items of income and deduction:

| Year | Rents | Deductions | |
| | | Interest | Depreciation |
| 1974 | · · · | $1,200,000 | $1,515,000 |
| 1975 | $1,905,444 | 1,486,444 | 2,575,500 |

The actual payments received by Regency from Copylease as rental payments, in excess of the amounts used to service the Regency notes, through October 1984, were as follows:

| Year | Excess rents received |
| 1975 | $249,996.00 |
| 1976 | 716,663.98 |
| 1977 | 694,161.56 |
| 1978 | 720,333.52 |
| 1979 | 380,174.11 |
| 1980 | 274,934.46 |
| 1981 | 242,944.56 |
| 1982 | 151,881.53 |
| 1983 | 54,523.58 |
| 1984 | 5,721.70 |
| | 3,491,335.00 |

The amounts paid to Valley Bank by petitioner and the four trusts as repayment of the amounts borrowed and used as their capital contributions to Regency, were as follows:

| Year | Principal | Interest |
| 1974 | 0 | 0 |
| 1975 | $95,000 | $105,553.58 |
| 1976 | 607,648 | 72,522.25 |
| 1977 | 612,352 | 23,275.58 |
| | 1,315,000 | 201,351.41 |

## OPINION

Respondent has raised numerous grounds upon which to disallow all or a part of the depreciation and interest deductions claimed by petitioner for the years in issue with

respect to this transaction. Respondent raised the issues of ownership and section 183 in his notice of deficiency. The issues of economic substance and the proper application of the half-year convention, however, were first raised by respondent in his amended answer. Respondent therefore bears the burden of proof with respect to these issues. Rule 142(a).[9]

Respondent has also attempted, on brief, to raise the following issues for the first time: (1) Whether the Regency note lacked sufficient economic substance to be included in Regency's depreciable basis in the equipment; (2) whether the Regency note is too contingent to support Regency's claimed interest expense deductions; (3) whether the $1,200,000 interest expense deduction claimed in 1974 was in substance a cash downpayment; and (4) whether the additional interest provisions of section 6621(c) are applicable. We do not believe that petitioner has received fair notice of these four issues and we will not consider them. *Seligman v. Commissioner*, 84 T.C. 191 (1985), affd. 796 F.2d 116 (5th Cir. 1986); *Estate of Horvath v. Commissioner*, 59 T.C. 551 (1973).

## Economic Substance

Respondent has alleged that the transaction in issue lacked sufficient economic substance to be recognized for Federal income tax purposes.

A sale and leaseback transaction is disregarded for Federal income tax purposes if it is determined "that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985), affg. in part, revg. in part 81 T.C. 184, 209 (1983). Based on this standard, a finding of lack of economic substance is inappropriate if either a business purpose or a reasonable possibility of profit apart from expected tax benefits is found to have been present. *Packard v. Commissioner*, 85 T.C. 397, 417 (1985). The record herein convinc-

---

[9]Unless otherwise stated, all Rule references are to the Tax Court Rules of Practice and Procedure.

ingly demonstrates that not only did petitioner have a reasonable possibility of realizing a profit apart from tax benefits but also that petitioner was virtually assured of realizing such a profit.

During the negotiations for the transaction, Hurwitz, as petitioner's counsel, investigated Alanthus and Copylease, discussed the proposal with Shuldiner as an independent consultant, and received a presentation and explanation of expected cash-flow from Getzler. Hurwitz also received a copy of Lew's appraisals of the fair market value of the equipment and expected residual value. Lew estimated that at the end of the lease term the equipment would have a residual value of $1,025,000.

Kitson's cash-flow projections showed that the expected contingent rent to be received by Regency would exceed the amount of Regency's up-front cash payments within approximately 29 months of the commencement of the transaction, plus an amount representing a return on such cash payments. Kitson's cash-flow analysis was reasonably based, at least in the early years covered therein, on existing end-user leases which provided for almost certain minimum cash-flow from the equipment in the early years of the transaction and on Copylease's experience leasing and re-leasing such equipment. The end-user leases existing at the time of the transaction and the high likelihood of profitably re-leasing the equipment for a substantial period of time following the termination of the initial leases would clearly leave a reasonable investor feeling confident that a substantial profit would be forthcoming during the term of the deal.[10] The likelihood of earning a substantial profit is further increased when expected residual value is taken into consideration.

Accordingly, in light of this Court's holding in *Rice's Toyota World, Inc. v. Commissioner, supra,* the transaction here in issue is not so lacking in economic substance that it can be disregarded for Federal income tax purposes.

---

[10]Admittedly, an investor's confidence in the profit potential inherent in this transaction would be significantly decreased were the debt underlying the transaction recourse rather than nonrecourse. The terms of this transaction, however, allow the investor to reap his profits in the early years of the transaction and retain such profits even if the net cash-flow from the equipment in the later years is insufficient to service the nonrecourse debt. The high likelihood of earning a substantial economic profit during the transaction's early years clearly distinguishes this transaction from the standard tax shelter.

## Benefits and Burdens of Ownership

Respondent's next contention is that Regency did not acquire sufficient benefits and burdens of ownership to be considered the owner of the equipment for Federal tax purposes.

Our holding that the transaction in question is not to be disregarded for Federal tax purposes does not foreclose further discussion of whether the form of the transaction must be accepted for Federal tax purposes. *Packard v. Commissioner, supra* at 419, citing *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). Respondent contends that petitioner does not possess sufficient attributes of ownership to be considered the owner of the computer equipment. Petitioner's position, of course, is to the contrary.

In *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981), we stated,

The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. *Commissioner v. Brown*, 380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * * to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. *Haggard v. Commissioner*, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). * * * [77 T.C. at 1237.]

In *Grodt & McKay Realty, Inc.* we also enumerated certain factors which are often relevant to determining whether a sale has occurred, such as: (1) Whether legal title passed; (2) whether the parties treated the transaction as a sale; (3) whether the alleged purchaser acquired an equity in the property; (4) whether the contract of sale creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the purchaser is vested with the right of possession; (6) whether the purchaser pays property taxes following the transaction; (7) whether the purchaser bears the risk of loss or damage to the property; and (8) whether the purchaser receives the profits from the operation and sale of the property. 77 T.C. at 1237-1238.

In the sale leaseback context, we have also considered the following factors as being relevant to determining whether a sale has occurred: (1) The existence of useful life of the property in excess of the leaseback term; (2) the existence of a purchase option at less than fair market value; (3) renewal rental at the end of the leaseback term set at fair market rent; and (4) the reasonable possibility that the purported owner of the property can recoup his investment in the property from the income producing potential and residual value of the property. *Estate of Thomas v. Commissioner*, 84 T.C. 412, 436, 438 (1985); *Mukerji v. Commissioner*, 87 T.C. 926 (1986).

In analyzing the transaction in this case, we first note that some of the factors enumerated in *Grodt & McKay Realty, Inc. v. Commissioner, supra,* are either less relevant in this case or must be considered in a different light because the transaction under consideration in that case did not include a leaseback of the subject property. Hence, because net leases are common in commercial settings, it is less relevant that petitioner was not responsible for the payment of property taxes or that petitioner bears less of a risk of loss or damage to the property because the lessee is required to maintain insurance on the property. Similarly, a lessor is normally not vested with the right of possession during the term of the lease and, therefore, the relevant consideration in this regard is whether the useful life of the property extends beyond the term of the lease so as to give the purchaser a meaningful possessory right in the property. Also, in a leaseback transaction it is normal for the lessee to receive profits from the operation of the property while the lessor's receipt of payments is less dependent upon the operation of the property.

One other factor which may be viewed differently because of the facts of this case is the relevancy of Regency's equity interest in the equipment. The relevancy of equity, in a case where only nonrecourse debt is used in the purchase of propery, is that the presence or absence of equity is likely to determine whether the purchaser of the property continues to act like the owner of the property. If equity is present, then economic considerations should lead the purchaser to continue to make payments on the nonrecourse

debt and protect his interest in the property. See *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). In this case, however, the nonrecourse debt is effectively self-amortizing and whether Regency continues to act like the owner of the equipment throughout the term of the lease is likely to depend on whether contingent rent is being generated by the equipment and whether a significant residual value is expected to exist at the end of the leaseback term. Nevertheless, we do believe that whether Regency paid fair market value for the equipment reflects upon the bona fide nature of the transaction and whether the form of the transaction should be respected for Federal tax purposes.

At the time of the transaction in issue, Robert Lew prepared an appraisal of the fair market value of the equipment, the expected residual value of the equipment after 15 years, and the expected remaining useful life of the equipment at the time of the transaction. At trial, three expert witnesses also offered their opinions regarding fair market value, residual value, and remaining useful life. Petitioner called two expert witnesses to testify on these matters; Robert Sullivan of Bob Sullivan & Associates, and Thaddeus Matrenga of Service Assurance Corp. Respondent called Louis Slawetsky of A.D. Little, Inc. The opinions of these appraisers regarding the fair market value, expected residual value, and remaining useful life of the equipment at the time of the transaction can be summarized as follows:

|  | Fair market value | Residual value | Useful life |
|---|---|---|---|
| Lew | $10,200,000 | $1,025,000 | 17 to 18 years |
| Sullivan | 9,500,000 to 10,300,000 | 200,000 to 1,010,000+ | 17 to 18 years |
| Matrenga | 10,100,000+ | 1,010,000+ | 15 to 18 years |
| Slawetsky | 8,272,000 | 202,000 to 505,000 | 7 to 10 years[11] |

Respondent's main objections to the appraisals supporting petitioner's position are (1) as a preliminary adjustment, the value of the used equipment in 1974 had to be

---

[11]Slawetsky's opinion was that the remaining useful life of the equipment was 10 years for the Xerox and IBM equipment and 7 years for the rest of the equipment. Also, Slawetsky's estimates of remaining useful life were measured from the time the equipment was first placed in service as opposed to the time of the transaction, November 1974. Slawetsky's estimates of residual value assumed, though he believed it unlikely, that the equipment would be maintained beyond its useful life.

decreased by 7 percent from list price to take into account a 7-percent tax credit available on new equipment at the time, and (2) the appraisals did not properly adjust for the loss in value resulting from the use and wear suffered by the equipment prior to the transaction here in issue.

Petitioner has apparently conceded the 7-percent adjustments, but alleges that the adjustments respondent would make for the used condition of the equipment are inappropriate because the equipment was subject to full-service maintenance agreements which prevented the value of the equipment from dropping significantly. Petitioner's main objection to Slawetsky's appraisal is also that the adjustments made in his appraisal for the used condition of the equipment were inappropriate because of the maintenance agreements.

The adjustments which the parties have disagreed about are explained in Slawetsky's appraisal report. In determining the fair market value of the equipment as of the date of the transaction, Slawetsky made the following adjustments:

(1) Equipment in place for less than six months would be valued at replacement cost, less 7% — the investment tax credit for which used equipment was ineligible.

(2) Equipment in place between seven months and eighteen months was valued at replacement cost, less the loss of market value for one year old assets. For the Xerox and IBM copiers, the estimated market value decline is 21.33%; for the Saxon, 28.50%.

(3) Equipment in place between nineteen months and twenty eight months was valued at replacement cost, less the lost market value for two year old assets. For the Xerox and IBM copiers the estimated market value decline is 35.66%.

At trial, Slawetsky admitted that in making his appraisal report he was unaware that the equipment was subject to full-service maintenance agreements. Slawetsky's report stated that,

Since maintenance was not being performed by Xerox personnel, it is doubtful that machines in the portfolio which were manufactured by these companies would have contained the engineering upgrades or would have benefitted from Xerox's extensive preventive maintenance programs.

In attempting to contrast Xerox equipment which was sold to third parties and Xerox rental equipment which was fully

maintained by Xerox, Slawetsky's report described Xerox' full maintenance policy for rental equipment and stated—

An important consequence of Xerox's policy was that users who chose to rent their equipment could make little distinction between new and used equipment. Their only interest was in selecting the actual model to be rented. Thereafter, there was assurance that the machine would be maintained in "like new" condition.

Xerox' full-service maintenance agreement states that the services provided "will be of the same quality and timeliness as those same services when performed for Xerox' rental customers." Further, Slawetsky's description of the effect of Xerox' maintenance policy for its rental equipment is substantially the same as the effect of Xerox' full-service maintenance agreements for non-rental equipment as described by Lew, Sullivan, and Matrenga. Each of those appraisers testified that the effect of a full service maintenance agreement was to maintain the equipment in a like new condition and that, therefore, very little loss of market value occurred while equipment was maintained under such an agreement.

Petitioner's experts also testified that any loss of market value resulting from the used state of the equipment was more than compensated for by the fact that the equipment was delivered, installed, and on lease to end-users at the time of the transaction. In this regard, we have previously held that a premium is appropriate where equipment is on lease to end-users by a reputable leasing company. *Mukerji v. Commissioner, supra.*

Petitioner criticizes Slawetsky's estimates of expected residual value and useful life on the same grounds as his estimate of fair market value. Slawetsky's report states that, theoretically, a photocopier "can last forever if properly maintained and periodically rebuilt." While we doubt that the equipment here in question can be expected to last forever, we do believe that petitioner has proven that if Slawetsky had known of the presence of the full-service maintenance agreements, his estimates of useful life and residual value would have been more favorable to petitioner's case.

Based on our review of the record as a whole, we believe that petitioner has established that (1) he paid approxi-

mately fair market value for the equipment; (2) at the time of the purchase, the equipment had an expected useful life in excess of the leaseback term; and (3) that the equipment could reasonably be expected at the time to have a significant residual value at the end of the leaseback term. We are unwilling to attempt the somewhat arbitrary endeavor of assigning specific numbers to each of these quantities. Under the facts of this case, we believe that such an attempt is unnecessary and we therefore move on to considering some of the other factors relevant to ownership.

Respondent contends that because the ownership of photocopiers is not generally registered or recorded in some formal manner, petitioner must establish that Copylease took some affirmative action to identify the equipment as belonging to Regency in order to demonstrate Regency's title to the property. Petitioner contends, however, that the agreements between the parties are sufficient to show that Regency had legal title to the equipment. Because there is no indication that Copylease held itself out as owner of the equipment following the sale, we find the agreements executed herein to be sufficient evidence of title.

With respect to the treatment of the transaction by the parties, there is no evidence in the record that Copylease or Regency treated this transaction as other than a sale at any time. The transactional documents treated the transaction as a sale, and Copylease's consolidated financial statement for its 1974 fiscal year reported the transaction as a sale leaseback to a third-party investor.

We next consider whether a present obligation to make payments existed. The fact that the amount of rent which was not contingent upon cash-flow equaled the payments required on the Regency note does not suggest that Regency lacked the benefits and burdens of ownership. As we have stated in this regard, "Rent during an initial lease term geared to the cost of interest and mortgage amortization is not, in and of itself, much more than a neutral commercial reality." *Estate of Thomas v. Commissioner,* *supra* at 436. Nonetheless, respondent contends that because of the deferral and offset provisions in the agreements executed by the parties, neither Copylease nor Regency had

present obligations to make payments. The fact that Regency could defer its payments to Curtis until Copylease had made its required payments of rent, however, does not lead us to such a conclusion. The agreements executed by the parties in this case created a present obligation on the part of Regency to make payments to Curtis on the Regency note. This obligation could be deferred only in the event Copylease failed to make its required rental payments, an event outside of Regency's control. In addition, Copylease's obligation to make payments of $137,954 per month was not contingent upon any event.

Respondent also contends that the division of the net cash-flow from the property demonstrates that Regency lacks the normal attributes of ownership. Respondent's main argument on this point is that it is inconsistent with the ownership of the equipment by Regency for Regency's share of the cash-flow from the property to decrease during the later years of the lease, when the nonrecourse debt is being amortized. Respondent argues that a normal investor would expect his share of the cash-flow from property to increase as he pays off the debt incurred in purchasing the property. Petitioner counters that his investment strategy was to recoup his investment as early as possible and that he therefore negotiated for a larger portion of the cash-flow early on in exchange for a smaller portion in the later years. We find petitioner's explanation to be plausible and consistent with the aspirations of an investor seeking an economic return. The cash-flow arrangements agreed to in this case are indicative of Regency's possessing the normal attributes of ownership.

The lease granted Copylease the option to purchase all, but not part, of the equipment upon the expiration of the lease term at a price equal to "the sum of (a) the fair market value of the Equipment * * * and (b) the difference between $5,315,000 and the total of all Rent theretofore paid by Lessee to Lessor hereunder other than [the fixed rent of $137,954 per month]." Respondent argues that because the total of the rents paid in excess of $137,954 per month was expected to exceed $5,315,000 by the end of the lease term, the second number to be summed in this calculation would be negative and that, therefore, Copylease

would be able to purchase the equipment for less than its fair market value. Petitioners argue that this is an absurd distortion of the lease's language. We do not believe that this language can reasonably be read to allow a negative number to result from calculating the difference between $5,315,000 and the total contingent rent paid. The language of the purchase option provision appears to contemplate that Copylease will have to pay at least the fair market value of the equipment in order to exercise the option.

Finally, Regency could, based upon the rights it received in the equipment, have a reasonable possibility of recouping its investment in the equipment, plus a substantial profit by looking solely to the income producing potential and residual value of the equipment. The existence of such a possibility is indicative of ownership where the terms of the transaction are not otherwise contrary to market expectations, such as where the investment is so small in comparison to the amount of nonrecourse debt as to make its return of little relevance.

Based on the above, we find that petitioner has demonstrated that Regency held substantial attributes of ownership with respect to the equipment. Accordingly, Regency is to be treated as the owner of the equipment for Federal tax purposes.

### Engaged in for Profit

Our next issue for consideration is whether Regency entered into the subject transaction with a bona fide intent to make a profit independent of tax benefits.

Section 183(a)[12] provides that "if [an] activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." The existence or absence of the requisite profit objective of a partner is determined at the partnership level by reference to the objectives of the general partner. *Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The determination turns on whether the general partner has a bona fide intent to make a profit. *Dreicer v. Commissioner*, 78 T.C.

---

[12]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

642, 643-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

The regulations under section 183 list nine factors which are normally taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectations that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2, Income Tax Regs.

Some of the factors listed above are of little or no relevance in determining whether an investment of the type presented in this case was engaged in for profit. We will limit our discussion to those factors which we consider relevant. While petitioner's advisors had fully researched the transaction and fully understood the economic and tax aspects of the transaction, we find this factor to have a neutral effect upon our determination, other than demonstrating that petitioner was almost certainly motivated by whatever economic and/or tax benefits were foreseeable at the time the transaction was entered.

With respect to the earning of a profit from a transaction, the regulations state, in part, that,

substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. [Sec. 1.183-2(b)(7), Income Tax Regs.]

In this case, Regency's total investment in the equipment was $1,315,000.[13] Kitson estimated that petitioner would

---

[13]The total investment made in this case might be viewed as the total of the payments of principal and interest made by petitioner and the four trusts to Valley Bank. This amount is

receive $3,472,421 of contingent rents by early 1981. By the end of 1984, petitioner had in fact received $3,491,334.70 in contingent rents. Regency's expected and actual profit on this transaction was in excess of $2,100,000, or 160 percent of the investment in the equipment. When added to the expected residual value of the equipment, this amount represents Regency's expected ultimate profit on the transaction and is clearly substantial. Further, the profit actually earned up to the time of trial was neither "occasional" nor highly speculative. We consider these facts to be strongly indicative of this transaction being engaged in for profit.

With respect to an investment activity such as the one presented by this case, the remainder of our analysis can be limited to a consideration of the conclusions which can be reasonably drawn from a review of the terms of the transaction and the information available to petitioner and his advisors at the time the deal was consummated. As we have stated, petitioner has demonstrated that Regency expected a large economic profit to result from its participation in this transaction. Based on the information available to petitioner and his advisors at the time the transaction was consummated, we believe that this expectation was reasonable. The opportunity to receive, in approximately 6 years, a return of approximately $2,100,000, plus recovery of the investment of $1,315,000, would seem to be a strong enough motivation to enter the transaction without any consideration of potential tax benefits.

Nevertheless, respondent argues that the tax benefits to be derived by petitioner from this transaction were so large in comparison to the economic benefits, that it cannot be reasonably believed that petitioner entered this transaction for the economic benefits. In *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986), we stated, in discussing the application of section 183 to the facts therein (pp. 557-558),

Obviously, a $70,000 profit on a $90,000 investment represents a substantial return on that investment, but we think that, while this standard may be valid for determining the potential for economic profit, it should not be determinative of the existence of the necessary profit

---

$1,516,351. Our holding in this case would not be altered by considering this amount to be Regency's total investment.

objective in determining the applicability of section 183. If such a standard were the sole criterion, we would have the ridiculous situation that the lower the amount of the cash investment and the higher the amount of nonrecourse financing, the more likely would be the existence of a profit objective. * * * [Fn. ref. omitted.]

We concluded that in evaluating the applicability of section 183 a comparison should be made between (1) the expected economic benefits to be derived from the transaction in excess of the amount invested and (2) the expected tax benefits to be derived from the transaction in excess of the amount invested. 83 T.C. at 558.

Respondent would have us compare tax benefits of approximately $17,900,000 (resulting from using $25,641,532 of deductions to offset income taxed at a 70-percent marginal rate) against the possibility of receiving $3,500,000 of contingent rents from the transaction. This argument completely ignores the fact that over the term of the transaction, petitioner will be required to include in income at least $24,831,720 as a result of the transaction. In fact, if contingent rent is received by Regency in excess of $809,812, the transaction will result in a net tax being paid during the term of the transaction.[14] If no contingent rent were received from the transaction, the net tax benefits of $556,868 (0.7 × $809,812) would be insufficient for petitioner to recover his investment of $1,315,000 and petitioner would have to rely on the residual value of the equipment in order to recover his investment. Therefore, this case does not involve a substantial disparity between the expected net tax benefits and the expected economic benefits over the term of the transaction. See *Waddell v. Commissioner*, 86 T.C. 848, 894 (1986); cf. *Estate of Baron v. Commissioner, supra*. Rather, the economic benefits of this transaction are expected to be substantial, while the transaction is not expected to produce any net tax benefits.

---

[14]This is demonstrated as follows:

| Deductions generated: | |
|---|---|
| Depreciation (assuming 5% salvage value) | $9,595,000 |
| Interest | 16,046,532 |
| Total deductions | 25,641,532 |
| Guaranteed rental income 180 x $137,954 = | 24,831,720 |
| Deductions remaining to offset contingent rental income .. | 809,812 |

If petitioner is to recover his investment, this must be the case.

At trial, respondent also offered the testimony of an expert witness in an attempt to prove the value of the deferral of tax liability created by the transaction. The expert witness offered his opinion that deferral benefits of this transaction would clearly be the motivating force behind an educated investor's decision to enter the transaction. Respondent's expert offered testimony regarding the value of the deferral of tax benefits, based upon deductions being used to offset income which would otherwise be taxed at 70 percent, and assuming a discount rate of between 10 and 20 percent. See *Estate of Baron v. Commissioner, supra* at 556-557 and n. 40. While we are hesitant to draw definite conclusions from this testimony, we do not believe that an analysis of the deferral benefits of this transaction supports respondent's position. This is demonstrated by using Kitson's cash-flow projections and assuming that all net cash-flow received by Regency is deposited in a sinking fund, while all tax benefits are deposited in a separate sinking fund from which all tax liabilities generated by the transaction are paid.

If the sinking funds earn 3 percent after tax (10 percent before tax at a 70-percent tax rate), at the end of the leaseback period the net cash-flow[15] will have generated $2,664,842, while the net tax benefits will have generated only $64,766. See table on pp. 732-733. If the sinking funds earn 6 percent after tax (20 percent before tax at a 70-percent tax rate), at the end of the leaseback period the cash-flow will have generated $3,604,981, while net tax benefits will have generated $2,900,614. See table on pp. 732-733. Even at the 6-percent-after-tax rates, the expected economic benefits of the transaction significantly outweigh the tax benefits. This conclusion is further buttressed by adding the expected residual value to the expected economic benefits from contingent rent.

---

[15]Respondent has argued that for purposes of determining the economic benefits to be derived from this transaction, i.e., the cash-flow, we should consider the payments on the Valley Bank loan to represent the investment in the transaction. For purposes of these calculations we will so treat the payments. We do not find such treatment to significantly help respondent's position.

| Year | Fixed income | Contingent income | Depreciation[1] | Regency note | | Valley Bank loan | |
|---|---|---|---|---|---|---|---|
| | | | | Amortization | Interest | Amortization | Interest |
| 1974 | 0 | 0 | $1,515,000 | 0 | $1,200,000 | 0 | 0 |
| 1975 | $1,655,448 | $250,000 | 2,575,000 | $169,004 | 1,486,444 | $95,000 | $105,554 |
| 1976 | 1,655,448 | 922,535 | 1,919,000 | 196,173 | 1,459,275 | 607,648 | 72,522 |
| 1977 | 1,655,448 | 694,237 | 1,919,000 | 227,709 | 1,427,739 | 612,352 | 23,275 |
| 1978 | 1,655,448 | 485,908 | 1,667,000 | 264,315 | 1,391,133 | | |
| 1979 | 1,655,448 | 516,657 | | 306,805 | 1,348,643 | | |
| 1980 | 1,655,448 | 516,876 | | 356,122 | 1,299,326 | | |
| 1981 | 1,655,448 | 86,208 | | 413,373 | 1,242,075 | | |
| 1982 | 1,655,448 | | | 479,823 | 1,175,625 | | |
| 1983 | 1,655,448 | | | 556,955 | 1,098,493 | | |
| 1984 | 1,655,448 | | | 646,490 | 1,008,958 | | |
| 1985 | 1,655,448 | | | 750,415 | 905,033 | | |
| 1986 | 1,655,448 | | | 871,049 | 784,399 | | |
| 1987 | 1,655,448 | | | 1,436,059 | 219,389 | | |
| 1988 | 1,655,448 | | | 1,655,448 | | | |
| 1989 | 1,655,448 | | | 1,655,448 | | | |
| Total | 24,831,720 | 3,472,421 | 9,595,000 | 9,985,188 | 16,046,532 | 1,315,000 | 201,351 |

[1]The figures for depreciation are based on the use of a 150 percent of declining-balance method, converting to the straight-line method so as to maximize the early deductions and by assuming a 5-percent salvage value.

| Cash-flow | Cash-flow sinking fund (3 percent) | Cash-flow sinking fund (6 percent) | Tax loss (income) | Tax savings (tax) 70 percent | Tax savings sinking fund (3 percent) | Tax savings sinking fund (6 percent) |
|---|---|---|---|---|---|---|
| 0 | 0 | 0 | $2,715,000 | $1,900,500 | $1,900,500 | $1,900,500 |
| $49,446 | $49,446 | $49,446 | 2,261,550 | 1,583,085 | 3,540,600 | 3,597,615 |
| 242,365 | 293,294 | 294,778 | 872,814 | 610,970 | 4,257,788 | 4,424,442 |
| 58,610 | 360,703 | 371,074 | 1,020,329 | 714,230 | 5,099,752 | 5,404,138 |
| 485,908 | 857,432 | 879,247 | 916,777 | 641,744 | 5,894,488 | 6,370,131 |
| 516,657 | 1,399,812 | 1,448,659 | (823,462) | (576,423) | 5,494,900 | 6,175,916 |
| 516,876 | 1,958,683 | 2,052,454 | (872,998) | (611,099) | 5,048,649 | 5,935,371 |
| 86,208 | 2,103,651 | 2,261,809 | (499,521) | (349,707) | 4,850,400 | 5,941,787 |
|  | 2,166,761 | 2,397,518 | (479,823) | (335,876) | 4,660,036 | 5,962,418 |
|  | 2,231,763 | 2,541,369 | (556,955) | (389,869) | 4,409,968 | 5,930,294 |
|  | 2,298,716 | 2,693,851 | (646,490) | (452,543) | 4,089,724 | 5,833,569 |
|  | 2,367,678 | 2,855,482 | (750,415) | (525,291) | 3,687,125 | 5,658,292 |
|  | 2,438,708 | 3,026,811 | (871,049) | (609,734) | 3,188,005 | 5,388,055 |
|  | 2,511,869 | 3,208,420 | (1,436,059) | (1,005,241) | 2,278,404 | 4,706,098 |
|  | 2,587,226 | 3,400,925 | (1,655,448) | (1,158,814) | 1,187,942 | 3,829,650 |
|  | 2,664,842 | 3,604,981 | (1,655,448) | (1,158,814) | 64,766 | 2,900,614 |
| 1,956,022 | 2,664,842 | 3,604,981 | (2,461,258) | (1,722,882) | 64,766 | 2,900,614 |

Accordingly, we find that petitioner has demonstrated that Regency entered into the sale leaseback with Copylease as an activity engaged in for profit within the meaning of section 183.

## Half-Year Convention

The final issue for decision is whether the half-year convention of section 1.167(a)-11(c)(2)(iii), Income Tax Regs., should be applied on the basis of a short taxable year for the year in which Regency first engaged in its rental activity.

Section 1.167(a)-11(c)(2)(i), Income Tax Regs., allows a taxpayer who has elected the ADR system of depreciating assets to adopt the "half-year convention" provided in section 1.167(a)-11(c)(2)(iii), Income Tax Regs. Pursuant to the "half-year convention," depreciation for an ADR vintage account[16] is determined by treating all property which is placed in service during a taxable year as placed in service on the first day of the second half of the taxable year. Section 1.167(a)-11(c)(2)(iv)(*b*), Income Tax Regs., provided in 1974, in part,

If the actual number of months in a taxable year is other than 12 full calendar months, depreciation is allowed only for such actual number of months, and the term "taxable year," for purposes of this subparagraph, shall mean only such number of months. In such event, the first half of such taxable year shall be deemed to expire at the close of the last day of a calendar month which is the closest such last day to the middle of such taxable year and the second half of such taxable year shall be deemed to begin the day after the expiration of the first half of such taxable year. If a taxable year consists of a period which includes only one calendar month, the first half of the taxable year shall be deemed to expire on the first day which is nearest to the midpoint of the month, and the second half of the taxable year shall begin the day after the expiration of the first half of the month. * * *

Petitioner argues that Regency's 1974 taxable year was a full 12-month year and that, therefore, Regency was properly entitled to 6 months of depreciation on the photocopying equipment in 1974. Respondent asserts that Regency's 1974 taxable year did not start until November 13, 1974, and was, therefore, less than 2 months long.

---

[16] See sec. 1.167(a)-11(b)(3), Income Tax Regs.

Section 7701(a)(23) defines the term "taxable year" as follows:

The term "taxable year" means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the taxable income is computed under subtitle A. *"Taxable year" means, in the case of a return made for a fractional part of a year under the provisions of subtitle A or under regulations prescribed by the Secretary, the period for which such return is made.* [Emphasis added.]

Similarly, section 441(b)(3) provides that for purposes of subtitle A, "taxable year" means the period for which a return is made, if a return is made for a period of less than 12 months. Section 443(a)(2) provides, in part, that a return for a period of less than 12 months must be made if a taxpayer is "in existence" during only part of what would otherwise be his taxable year.

As the parties have framed the issue, the question of the proper application of the half-year convention turns on the determination of when a partnership comes into existence for Federal income tax purposes. Respondent contends that a partnership does not come into existence for Federal income tax purposes until it has a duty to file a return, which does not occur until the partnership begins to conduct business. See sec. 1.6031-1(a)(1), Income Tax Regs. Petitioner, on the other hand, has not enlightened us on his view of when a partnership comes into existence, but rather argues that the commencement of business is not required in order for a partnership to come into existence and that, therefore, Regency was in existence for all of 1974.

Respondent and petitioner have each cited us to numerous sections of the Internal Revenue Code and regulations which they consider relevant to the determination of when a partnership comes into existence. The parties have argued extensively over the implications of the sections of the Internal Revenue Code and regulations which bear on the filing of returns by partnerships and, for purposes of analogy, corporations. None of these sections, however, contains a provision which defines the starting point of a partnership's existence. Further, these sections were clearly not intended to define the time at which a partnership comes into existence.

The parties have presented this issue as one of first impression and have not alleged that cases exist which are directly on point. There is a substantial body of law, however, which defines the characteristics that a venture must have in order to constitute a partnership for Federal tax purposes. We believe that the factors which determine whether a venture is a partnership for Federal tax purposes must inherently also define when a venture becomes a partnership for such purposes. We therefore consider the characteristics of a partnership for Federal tax purposes.

Section 761(a) states in part,

For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization *through or by means of which any business, financial operation, or venture is carried on*, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. * * * [Emphasis added.]

The Supreme Court has stated that the existence of a partnership depends upon "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the *present conduct of the enterprise.*" *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) (Fn. ref. omitted; emphasis added.); see also *Commissioner v. Tower*, 327 U.S. 280 (1946); *Sparks· v. Commissioner*, 87 T.C. 1279 (1986).[17] Based on the above, for Federal tax purposes a partnership cannot exist unless the parties thereto have a good-faith intent to *presently* conduct an enterprise with a business purpose. This requirement may in some situations lead to issues such as whether intending to presently conduct an enterprise with a business purpose should be considered synonymous with actually engaging in business or what level of activity or engagement in business is necessary for a partnership to come into existence. On the facts of this case, however, we do not believe that it is necessary for us to delve into these more detailed issues. The parties who established Regency clearly did not have a good-faith intention to presently conduct an enterprise with a business purpose prior to entering into the sale leaseback transaction here under consideration.

---

[17] See also *Estate of Somashekar v. Commissioner*, T.C. Memo. 1987-125.

Regency was organized as a limited partnership under the laws of the State of Connecticut in December 1973, with Hurwitz as its sole general partner and Goldenberg as its sole limited partner. Two days before the consummation of the transaction here in issue, the partnership agreement was amended and petitioner became the sole general partner of Regency, the four trusts for petitioner's children became limited partners, and Hurwitz and Goldenberg became limited partners with only nominal interests. Regency's 1974 partnership return shows that at the beginning of 1974, Regency had no assets and no liabilities. The return shows that at the end of 1974, Regency's only assets were the equipment subject to the sale leaseback and $200 in "capital contribution receivables" from Hurwitz and Goldenberg, and that Regency's only liability was the Regency note.

Based on the above facts, we conclude that Regency was not involved in conducting any enterprise prior to the transaction here in issue. Petitioner has not alleged that Regency did conduct any activities prior to this transaction. Further, Regency was without capital prior to the amending of the partnership return and was incapable of conducting any business. Clearly, the parties involved in Regency did not intend to presently conduct any enterprise through Regency until the consummation of the sale leaseback transaction. As such, in accordance with the definition of a partnership for Federal tax purposes, Regency did not come into existence as a partnership prior to engaging in the sale leaseback transaction with Copylease.

Accordingly, Regency had a short 1974 taxable year which commenced on November 13, 1974. Secs. 441(b)(3), 443(a)(2). Therefore, pursuant to section 1.167(a)-11(c)(2)(iv)(b), Income Tax Regs., Regency was not entitled to depreciation in 1974 based on applying the half-year convention to a 12-month taxable year, but rather must apply such convention to the short taxable year commencing on November 13, 1974.

*Appropriate orders will be entered.*