JOHN H. WARREN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN H. WARREN AND GEORGEANNE F. WARREN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Warren v. Commissioner
Docket Nos. 44967-86; 45054-86.
United States Tax Court
T.C. Memo 1989-34; 1989 Tax Ct. Memo LEXIS 34; 56 T.C.M. (CCH) 1125; T.C.M. (RIA) 89034; January 19, 1989. Stephen D. Gardner, John Hartje, and Michael G. Lefkowitz, for the petitioners. Rose E. Gole and Gail A. Berruti, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and additional interest as follows: Petitioner
Year
Deficiency
John H. Warren
1980
$ 27,460
44967-86
1982
12,928
1983
15,313
Georgeanne F.
1981
26,703
and John Warren
45054-86
Additions to Tax and Interest
Sec.
Sec.
Sec.
Sec.
Sec.
Petitioner
6653(a)(1) [1]
6653(a)(2)
6659
6661
6621(c)
John H. Warren
* $ 1,373 -
-
- ****
44967-86
646 50 percent
$ 3,878 ** **** of the interest due on $ 12,928
766 50 percent
4,594 *** **** of the interest due on $ 15,313
Georgeanne F.
1,335 50 percent
8,011
- ****
and John Warren of the
45054-86 interest due on $ 26,703
*36 The issues for decision are (1) whether petitioners are entitled to any Schedule C losses in connection with petitioner John H. Warren's (petitioner's) purchase and leaseback of reprographic equipment during the taxable years in issue, and if so, whether the losses are limited by the amounts for which petitioner was "at risk" under section 465 with respect to the purchase price of the equipment; (2) whether petitioners are entitled to investment tax credits on the reprographic equipment for the taxable years 1980 and 1981; (3) whether *37 petitioners' tax liability for 1981 can be computed using income averaging; (4) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a); (5) whether petitioners' underpayment of tax, if any, is attributable to a valuation overstatement within the meaning of section 6659; (6) whether petitioner is liable for additions to tax under section 6661; and (7) whether petitioner's equipment leasing activities are tax motivated transactions for purposes of computing interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in West Gilgo Beach, New York, when the petitions were filed. Background
The issues before us stem from petitioner's purchase and leaseback transactions in 1980, 1981, and 1982 with Copylease Corporation of America (Copylease), Reprographics Management, Inc. (RMI), a subsidiary of Copylease, and Quantrex Corporation (Quantrex), the successor to Copylease (collectively referred to as Copylease). Petitioner graduated from Cornell Law School in *38 1966. He then served approximately 2 years as a special agent with the Federal Bureau of Investigation. For approximately 2 years thereafter, petitioner was an associate attorney with a large New York law firm and dealt with leasing transactions and leveraged investments. Copylease was founded in 1971 by Herbert L. Getzler (Getzler), who throughout Copylease's existence served as its president and chairman. Copylease was engaged in the business of leasing reprographic equipment to end-users. It would purchase the equipment from manufacturers, primarily Xerox Corporation (Xerox), after a lease commitment had been obtained from an end-user. Typically, Copylease would lease the equipment to end-users in the mid-volume to high-volume markets for initial periods of 1 to 3 years at rental rates below those offered by the manufacturers. The cost of the equipment would not be recovered during the term of the initial rental agreement, making the success of Copylease's business dependent on its ability to maintain its equipment in good working condition and to remarket it beyond the initial lease period. Copylease generally entered into service contracts, or Full Service Maintenance *39 Agreements, with Xerox with respect to Xerox equipment. Xerox's Full Service Maintenance Agreement was a contract between Xerox and the owner or end-user of Xerox equipment which provided for the maintenance of the equipment in good working order. Xerox's service entailed (1) preventive maintenance whereby machines were serviced regularly to ensure that they were running at peak capacity and (2) emergency service. The term of the contract was typically 1 year and was renewable. In 1980, Xerox would guarantee the serviceability of its equipment for a period not to exceed 5 years, after which time Xerox would renew that guarantee on a year-to-year basis if the owner or user was willing to submit the equipment for complete rebuilding at the owner's or user's expense. Copylease began purchasing Xerox Model 2400 and Model 7000 printers in 1971. Some units remained on lease through 1979. Xerox introduced the Model 2400 series and the Model 7000 series in 1963 and 1968, respectively. Through a series of events prior to the taxable years in issue, petitioner became well acquainted with the business of Copylease. Petitioner first came in contact with Copylease in 1971 while counselling *40 a client with respect to his investment in Copylease. In 1973, Alanthus Computer Corporation (Alanthus) acquired Copylease. Petitioner represented the Copylease shareholders in the acquisition. In 1975, petitioner represented the former shareholders of Copylease in a renegotiation of the contingent payout portion of Alanthus' purchase price. In late 1978 or early 1979, petitioner was retained by Getzler and a group of investors to represent them in the repurchase of Copylease from Alanthus. Petitioner also was the chief negotiator with Midlantic Bank in New Jersey for a $ 3 million loan to finance the repurchase of Copylease. In the course of these events, petitioner frequently reviewed Copylease's financial statements and had numerous discussions with Getzler and Andrew Kitson (Kitson), then controller of Alanthus, about the financial condition and business of Copylease. Petitioner personally invested $ 10,000 in Copylease in 1979 out of a total of $ 300,000 of equity invested by the entire group of investors. Petitioner subsequently acquired up to 28 percent of the Copylease stock. After the investors acquired Copylease, Kitson served as Copylease's vice president and controller, *41 and petitioner became secretary, vice chairman and general counsel. In such capacities, petitioner participated in the management of Copylease and had daily contact with its executives. In 1980, Copylease entered the low-end Canon photocopier market by acquiring University Copier Corporation (University Copier), a Canon dealership in Orange County, California. Petitioner negotiated for the acquisition of University Copier. Although University Copier had been in the purchase and sales business, Copylease sought to duplicate with Canon copiers what it had done with Xerox machines by leasing its Canon copiers to users. Copylease subsequently opened five Canon leasing dealerships across the country. Because Canon, unlike Xerox, did not have a national service force, Copylease established service staffs at each dealership to service its Canon copiers on lease. On June 30, 1980, Copylease purchased from Xerox three Xerox Model 1200 computer printing systems (Xerox 1200 or Xerox equipment). At the time of Copylease's purchase, the Xerox 1200's were on site at Atlantic Container Lines, Ltd. (ACL), Hughes Aircraft Co. (Hughes), and Burndy Corporation (Burndy). Copylease purchased the *42 Xerox 1200's on site at Hughes and Burndy (Serial Nos. 5015 and 5363) for, respectively, $ 100,000 less $ 30,000 in purchase option credits assigned to it by Hughes or Burndy. Copylease purchased the Xerox 1200 (Serial No. 5600) on site at ACL for $ 125,000 less $ 55,000 in purchase option credits assigned to it by ACL. Copylease ultimately acquired only 10 to 15 Xerox 1200's because there was a very selective market for that model. The Xerox 1200 was technically a non-impact printer, rather than a photocopier. It was used in centralized data processing centers, producing large volumes of output from a centralized computer system. The Xerox 1200, introduced by Xerox in 1973, was capable of printing directly from digital output at a speed of 60 pages per minute. Copylease executed respective 24-month leases with ACL, Burndy, and Hughes in connection with the Xerox equipment. The lease between Hughes and Copylease commenced on June 1, 1980. It established a monthly rent of $ 2,410. It gave Hughes the option to purchase the Xerox 1200 (Serial No. 5015) for the sum of $ 70,000 less 50 percent of all rental payments made until the time the option was exercised. The lease between *43 Burndy and Copylease commenced on July 1, 1980 and established a monthly rent of $ 2,550. The lease between ACL and Copylease commenced on July 1, 1980, and set forth a monthly rent of $ 2,410. It was extended by an agreement dated June 21, 1982, for a period of 36 months commencing on July 1, 1982 at the previous rental rate. The leases required ACL, Burndy, and Hughes to maintain Full Service Maintenance Agreements with Xerox. ACL, Burndy, and Hughes paid lower rent to Copylease in exchange for the assignment of the purchase option credits. The Xerox 1200 (Serial No. 5015) was manufactured in September of 1974 and was installed at Hughes in November of 1979. The Xerox 1200 (Serial No. 5363) was manufactured in July of 1976. The Xerox 1200 (Serial No. 5600) was manufactured in November of 1977. Petitioner's Transactions
The 1980 Transactions
Petitioner entered into a purchase agreement dated December 31, 1980, with Copylease for the acquisition of the three Xerox 1200's on site at ACL, Hughes, and Burndy. Petitioner ostensibly purchased the Xerox equipment for $ 300,000, consisting of a $ 3,000 cash downpayment and a 15-percent nonnegotiable promissory note *44 in the amount of $ 297,000. The note was payable in 84 monthly installments of $ 5,660 each, payable on the first day of each month, commencing on January 1, 1981. In addition, petitioner paid Copylease a brokerage fee of $ 5,250 and administrative and filing fees of $ 750. The Xerox equipment was subject to a lien in favor of a lending institution of $ 210,000, which secured loans obtained by Copylease when it purchased the equipment. Petitioner agreed that his interest was subordinate to the lien. At the time of this agreement, the Xerox equipment remained subject to user leases between Copylease and ACL, Hughes and Burndy. Copylease had a very limited track record then with respect to the leasing of Xerox 1200's. Simultaneously with the purchase transaction, petitioner entered into an agreement with Copylease to lease the Xerox equipment to Copylease for a period of 7 years. The lease terms provided for 84 consecutive monthly payments of rent in the amount of $ 5,660 beginning January 1, 1981, and ending on December 1, 1987. The rent due to petitioner under the terms of the lease with Copylease exactly equaled the note payments due to Copylease under the provisions of *45 petitioner's nonnegotiable note. Petitioner also entered into a Marketing Agreement with Copylease dated December 31, 1980. Under the Marketing Agreement petitioner appointed Copylease as his agent for purposes of marketing the equipment after the term of the lease. For its services, Copylease would be entitled to 15 percent of all consideration received in respect of any marketing, whether by sale or lease, of the Xerox equipment, after payment of (a) all other marketing expenses (not to exceed 15 percent of all gross proceeds), and (b) an amount equal to $ 45,000 payable to Copylease as an administrative fee which would come from the first rentals received under any lease, or from the proceeds of any sale of the Xerox equipment. The 1981 Transactions
During 1981, Copylease changed its name to Quantrex Corporation. RMI was a wholely owned subsidiary of Quantrex. Petitioner entered into a purchase agreement dated December 31, 1981, with RMI for the acquisition of 15 Canon photocopier machines (1981 Canon equipment or Canon equipment). Petitioner ostensibly purchased the 1981 Canon equipment for $ 97,215, consisting of a downpayment of $ 1,215 and a 15-percent nonnegotiable *46 promissory note in the amount of $ 96,000. The note was payable in 84 monthly installments of $ 1,830 each, payable on the first day of each month, commencing on January 1, 1982. Petitioner also paid Copylease a brokerage fee of $ 2,500 and administrative and filing fees of $ 285. At the time of the transaction, the 1981 Canon equipment was subject to user leases between RMI and various third parties for terms ranging from 12 to 38 months and had been on site 1 to 5 months. The 1981 equipment was subject to a lien in favor of a lending institution not to exceed $ 78,300, and petitioner agreed that his interest was subordinate to the lien. Simultaneously with the purchase transaction, petitioner entered into an agreement with RMI to lease the 1981 Canon equipment to RMI for a period of 7 years. The lease terms provided for 84 consecutive monthly payments of rent in the amount of $ 1,830 beginning January 1, 1982, and ending on December 1, 1988. The note payments due to RMI exactly equaled the rent payments due to petitioner from RMI. Petitioner also entered into a Marketing Agreement with RMI dated December 31, 1981. After the term of their lease, RMI, as petitioner's agent, *47 would receive as marketing fees 15 percent of the consideration received in respect of any marketing, whether by sale or lease, of the 1981 equipment, after payment of (a) all other marketing expenses (not to exceed 15 percent of the gross proceeds), and (b) an amount equal to $ 14,582 payable to RMI as an administrative fee which would come from the first rentals received under any lease of the 1981 Canon equipment or from the proceeds of the sale of such equipment. The 1982 Transactions
Petitioner entered into an agreement dated December 31, 1982, with Quantrex for the acquisition of 10 Canon photocopier machines (1982 Canon equipment or Canon equipment). Petitioner ostensibly purchased the 1982 Canon equipment for $ 101,150, consisting of a downpayment of $ 1,150 and a 15-percent nonnegotiable promissory note in the amount of $ 100,000. The note was payable in 84 monthly installments of $ 1,906 payable on the first day of each month commencing on January 1, 1983. Petitioner also paid Copylease $ 3,050 in brokerage, administrative and filing fees. On the date of the agreement, the 1982 Canon equipment was subject to leases between Quantrex and an end-user and had *48 been on site for approximately 1 year. The 1982 Canon equipment was subject to a lien in favor of a lending institution in the amount of $ 117,100, and petitioner agreed that his interest was subordinate to the lien. Simultaneously with the purchase transaction, petitioner entered into an agreement with Quantrex to lease the 1982 Canon equipment to Quantrex for a period of 7 years. The lease terms provided for 84 consecutive monthly payments of rent in the amount of $ 1,906 beginning January 1, 1983, and ending on December 1, 1989. The rent due to petitioner under the terms of the lease with Quantrex exactly equaled the note payments due to Quantrex under the provisions of petitioner's nonnegotiable note. Petitioner entered into a Marketing Agreement with Quantrex dated December 31, 1982. Following the term of the lease, Quantrex, as petitioner's agent, would be entitled to 15 percent of the consideration received in respect of any marketing, whether by sale or re-lease, of the 1982 Canon equipment, after payment of (a) all other marketing expenses, (not to exceed 15 percent of gross proceeds) and (b) an amount equal to $ 15,173 payable to Quantrex as an administrative fee *49 which would come from the first rentals received under any lease of the 1982 Canon equipment or from the proceeds of the sale of such equipment. Post-Transaction Activity
The three leases between petitioner and Copylease were net leases. Each lease required Copylease to keep all equipment while in use under maintenance agreements. Each lease permitted Copylease to substitute other equipment for petitioner's equipment if the substitute equipment was of equal or greater value and Copylease gave petitioner 30-days notice. Concomitantly with each purchase-leaseback transaction, Copylease executed a security agreement with petitioner which authorized it to file financing statements in such form as was necessary to perfect or continue the perfection of a security interest in the subject equipment. Although petitioner paid a filing fee at the time of the three transactions in issue, no filings were ever made. In late 1982 and in 1983, Quantrex, by Kitson as vice president, entered into one 24-month lease and three 36-month leases with end-users of four of petitioner's Canon copiers. Quantrex granted each end-user the option to purchase the copier upon expiration of the user *50 lease for a specified amount ranging from $ 1 to $ 831.60. In 1983 Xerox stopped selling the Xerox 1200. It guaranteed service and made parts available for the model only through the end of 1987. In September 1983, Quantrex transferred title to the Xerox 1200 (Serial No. 5600) to ACL, at which time ACL traded the unit to Xerox for a Model 8700 electronic printing system. Xerox then retired the unit from its machine base. In November 1983, Computer Science Corporation in California traded in Xerox 1200 (Serial No. 5363) for a Model 8700 unit. The trade-in value provided by Xerox on each of these Xerox 1200's was $ 10,000. Petitioner never received any notice that any of his equipment was replaced by other equipment. In December 1983, Quantrex was sold to the owners of Copystatistics, Inc. (Copystatistics). Petitioner represented Copylease in the acquisition. Petitioner did nothing, however, to ensure that the new lessee would protect his equipment. Petitioner had no continuing role with Copystatistics after the acquisition. During the terms of his leasebacks, petitioner made no effort to determine the location of any of his equipment until January 1988 (after these cases *51 were set for trial), when he wrote to Copystatistics. He never inquired whether the Xerox equipment was being maintained under Full Service Maintenance Agreements. Petitioner did not keep books and records and spent none of his time during the years in issue in connection with his personal equipment leasing business. Petitioner never made any payments to Copylease on its promissory notes and never received rent from Copylease. Petitioner's promissory notes were never called. Tax Treatment
Petitioner filed individual income tax returns for the taxable years 1980, 1982, and 1983 and, with petitioner Georgeanne F. Warren, filed a joint return for 1981. Petitioners claimed Schedule C losses from petitioner's equipment leasing activities for the taxable years 1980 through 1983 in the amounts of $ 29,286, $ 30,731, $ 42,956, and $ 31,176, respectively. Petitioners' Schedules C merely disclosed that petitioner was in the businesses of practicing law and leasing photocopy equipment and listed amounts of income and deductions. On their returns for the years in issue, petitioners depreciated the Xerox equipment under the straight-line method based on a useful life of 7 years. *52 Petitioners depreciated the Canon equipment using a recovery period of 5 years. In computing the depreciation, petitioners reported initial basis in the 1980 equipment, the 1981 equipment and the 1982 equipment of $ 298,000, $ 97,215, and $ 101,150, respectively. Petitioners also claimed investment tax credits of $ 10,000 and $ 9,722 for 1980 and 1981, respectively. Petitioner computed his 1980 credit using a basis of $ 100,000. Petitioners computed their 1981 credit using a basis of $ 97,215. Petitioners used the income averaging method provided for in section 1301 et seq. to compute their 1981 tax. In his notice of deficiency, respondent disallowed the losses and investment tax credits and determined additions to tax and interest as previously set forth. Respondent computed petitioners' 1981 tax liability without using income averaging. In an amendment to his answer filed March 23, 1988, respondent asserted an increased addition to tax pursuant to section 6661 in the amount of 25 percent of the understatement of tax for the taxable years 1982 and 1983. OPINION 1. Schedule C Losses and the Investment Tax Credits
The first issue is whether petitioners are entitled *53 to claim losses incurred in connection with petitioner's equipment leasing activity. Respondent provides several familiar theories for disallowing petitioners' depreciation and interest expense deductions in full or in part, including (1) petitioner did not acquire sufficient benefits and burdens of ownership to be treated as the owner of the equipment for tax purposes, (2) the transactions in issue were shams and lacked economic substance, (3) petitioner did not engage in the equipment leasing activities for profit, (4) petitioner's promissory notes to Copylease were not genuine indebtedness, and (5) petitioner was not at risk under section 465 on the promissory notes to Copylease. Each of petitioner's three leasing transactions was similarly structured. The terms of the deals provided for the ostensible purchase by petitioner of reprographic equipment from Copylease. The purchase price for each of the Xerox 1200's acquired, as well as the sets of Canon equipment, was approximately $ 100,000, consisting of an approximately 1-percent cash downpayment. The remainder of the purchase price was payable by a 15-percent, 7-year nonnegotiable promissory note. In addition, petitioner *54 paid in cash administrative, brokerage and filing fees. Petitioner simultaneously executed a 7-year leaseback with Copylease with respect to the equipment. The note payments due to Copylease equaled the rental payments due to petitioner. Further, petitioner entered into marketing agreements with Copylease which were to grant Copylease substantial compensation for selling or leasing petitioner's equipment upon the end of each leaseback. We conclude that the transactions between petitioner and Copylease did not constitute sales for tax purposes; thus we need not address respondent's alternative arguments relative to petitioners' depreciation deductions. The key to deciding whether a transaction constituted a sale for Federal income tax purposes is to determine whether the benefits and burdens of ownership passed to the purported investors. Whether the benefits and burdens of ownership passed is a question of fact that must be ascertained from the intentions of the parties as reflected in the written agreements read in light of all of the relevant facts and circumstances. Levy v. Commissioner,91 T.C. 838, 860 (1988); *55 Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). In the equipment purchase and leaseback context, the following factors are relevant to determining whether a sale has occurred: (1) The potential for realizing a profit or loss on the sale or re-lease of the equipment; (2) the payment of fair market value for the equipment; (3) a useful life of the property that extends beyond the lease term; (4) the investor's initial equity interest in the equipment as a percentage of the purchase price; (5) lease renewal or purchase options at the end of the lease term based on fair market value of the equipment at that time; (6) whether the projected residual value of the equipment plus the cash flow generated by the rental of the equipment allows the investors to recoup at least their initial cash investment; (7) whether at some point a "turnaround" is reached whereby depreciation and interest deductions are less than income received from the lease; and (8) whether the net tax savings for the investors are less than their initial cash investment. Levy v. Commissioner,91 T.C. at 860; *56 Torres v. Commissioner,88 T.C. 702, 721 (1987). We generally consider as neutral factors in this context (1) the use of a net lease; (2) the absence of significant positive net cash flow during the lease term; and (3) the fact that the rental income stream during the initial lease term is tailored to or matches interest and debt payments that are due. Larsen v. Commissioner,89 T.C. 1229, 1267 (1987); Estate of Thomas v. Commissioner,84 T.C. 412, 433-438 (1985). The parties' principal dispute here concerns whether petitioner reasonably expected to realize economic profits on the marketing of the equipment upon the expiration of the leasebacks. The evidence suggests that he did not. Our determination rests on an analysis of the equipment's useful life and residual value. These are appropriate subjects for expert testimony. Louis E. Slawetsky (Slawetsky), a witness for respondent, provided the only expert opinion in this regard. Slawetsky had 22 years' experience in valuing reprographic equipment. Slawetsky was the president of Industry Analysts, Inc. (Industry Analysts), a consulting and marketing firm specializing in *57 office automation. Slawetsky's appraisals were based on transactional data collected by Industry Analysts and as reported in "The Used Copier Report." This publication was first published by Industry Analysts in January 1982, although the research used to produce that issue was conducted for 18 months prior to that date. In calculating the equipment's residual value, Slawetsky assumed that the equipment was new at the time the initial leases were signed. His assumptions for technological obsolescence were made at the beginning of the lease term rather than at the end. Slawetsky concluded that the total residual value of petitioner's equipment portfolio, based on data available at the beginning of each leaseback, was $ 57,247, as follows: Term
Retail
of
Dealer
Equipment
Quantity
New
Years
Discount
Xerox 1200
3
$ 100,000
7
0 Canon NP80
1
6,495
7
15%
Canon NP200
7
3,595
7
15%
Canon NP400F
6
8,715
7
15%
Canon NP400FS
10
10,115
7
15%
Total
Erosion
Equipment
Rate/Year*
Good**
Net
Subtotal
Xerox 1200
15%
30%
$ 9,617
$ 28,851
Canon NP80
20%
30%
997
997
Canon NP200
7%
30%
551
3,857
Canon NP400F
7%
30%
1,337
8,022
Canon NP400FS
7%
30%
1,552
15,520
Total
$ 57,247
*58 Slawetsky believed that the Xerox 1200 computer printer approached technological obsolescence in 1980 and had a useful life at the time of the transaction of less than 5 years. He determined that the useful life of a Canon copier was approximately 3 1/2 years. He also believed that rental rates tend to follow the value of the equipment. We have some reservations about Slawetsky's reliance on the "Used Copier Report," the first edition of which was published a year after the first transaction, and his reliance on data relating only to sales and not to leases. Nevertheless, we find his opinions overall to be objective, reasonable, and persuasive. We thus conclude that, at the time of the transactions at issue, the useful life of petitioner's Xerox 1200's and Canon equipment was approximately 5 years and 3 1/2 years, respectively, and that the expected total residual value of all of the machines upon the expiration of the leasebacks was not more than $ 60,000. *59 This residual value clearly would have been eclipsed by Copylease's compensation under the marketing agreements -- to wit, administrative fees ranging from $ 14,582 to $ 45,000, a 15-percent commission on lease or sale proceeds, plus payment for marketing expenses -- which assured that petitioner could neither recover his investment nor profit from the transactions. Other evidence supports these conclusions. The terms of the option granted by Copylease to Hughes in 1980 to purchase the Xerox 1200 would, at constant rental rates, have passed title to Hughes in less than 5 years. Xerox stopped selling the 1200 printer in 1983, and the trade-in value of two of petitioner's Xerox 1200's then was $ 10,000. Kitson granted certain end-users of petitioner's Canon equipment in 1982 and 1983 purchase options which were exerciseable at nominal prices at the end of 24-month and 36-month leases. Getzler acknowledged that for Copylease's purposes, the Xerox 1200 was overpriced until Xerox began providing purchase credits for that model. Getzler also acknowledged that the Canon equipment's useful life was "much shorter" than that of Xerox equipment. Petitioners assert that the terms of the *60 purchase options under various subleases had no relevance to the residual value because of the substitution provisions under each leaseback. It would be illogical to assume the terms of the purchase options, analogous to sales, were no reflection of market value. In any event, we are not persuaded that the terms of the substitution clauses were intended to be complied with, as indicated by Copylease's sale of at least some of petitioner's units without notifying petitioner. Petitioners assert that the equipment's expected resale value was irrelevant in determining the residual value of the equipment. Petitioners explain on brief that "Mr. Warren never contemplated selling the Equipment," and concede that "Mr. Warren knew that if [Copylease's] remarketing force could not be maintained, his Equipment would essentially become valueless." Rather, petitioners argue that the residual value anticipated was the potential rental stream from continued rentals. Petitioners assert that based on Copylease's 9 years of experience with other, technologically older equipment and its analysis with respect to the newer technology of petitioner's Xerox 1200 and Canon equipment, the executives of *61 Copylease, including petitioner, reasonably expected his equipment would be rented at constant rental rates for 10 to 15 years. In support of their assertion, petitioners contend that in 1971 Copylease began purchasing and leasing the Xerox Model 2400 and Model 7000, each introduced in the 1960s, and as of 1979 or 1980 many of these machines were still on lease. By comparison, petitioners note that the Xerox 1200 printer was based on technology which was only 7 years old in 1980 and assert that the Canon equipment was based on revolutionary technology. Petitioners further contend that the maintenance agreements with Xerox and the service Copylease was to provide with respect to the Canon equipment, as required by the terms of the leaseback, would have assured the economic longevity of the equipment. It is reasonable to analyze the performance of pre-existing machines technologically comparable to the equipment at issue to determine the economic life of the equipment at issue. Cf. Larsen v. Commissioner,89 T.C. at 1255. Nevertheless, petitioners have not persuasively *62 demonstrated that the useful life and residual value of petitioner's equipment could have reasonably been determined by reference to Copylease's experiences with the Xerox Model 2400, Model 7000, or other models. Neither of petitioners' two witnesses, Getzler and Kitson, could produce or describe any specific profit projections made with respect to petitioner's Xerox 1200's or Canon equipment. Neither could remember having any conversations with petitioner on the projected useful life or residual value of the Xerox 1200 or the Canon equipment. The record is barren of any specific evidence supporting a finding that the useful life and rental stream of petitioner's equipment would exceed 7 years. In regard to the projected effect of the maintenance agreements, the evidence establishes that petitioner was indifferent as to whether the Xerox equipment was maintained under such agreements. There is no evidence suggesting that such agreements were continued for the duration of the leaseback. The maintenance agreements did not warrant against technological obsolescence. Moreover, there is no persuasive evidence that Copylease's service of the Canon equipment would have materially extended *63 the life of that equipment. Nor is there any basis for concluding that petitioner ever acquired more than an insubstantial equity interest in the equipment. Petitioner's initial equity interest was merely 1 percent of the purchase price. Compare Frank Lyon Co. v. United States,435 U.S. 561, 585 (1978) (6 percent); Torres v. Commissioner,88 T.C. 702, 709 (1987) (12 percent); Levy v. Commissioner,91 T.C. 838, 861 (1988) (25 percent). Petitioner subsequently did not obtain a greater equity interest in the equipment because, as discussed below, his putative recourse promissory notes to Copylease were illusory. Thus, petitioner was never deterred by economic considerations from abandoning his interest. The illusory nature of the notes also leads us to conclude that petitioner did not pay fair market value for the equipment. The absence of any real equity is reflected by the following colloquy at trial between petitioner and his counsel: Q So, just to summarize, what exactly was it that you thought you were buying in 1980, 1981 and 1982 when you purchased this equipment? A I was buying a stream of earnings that *64 began immediately upon completion of the payment of my note which constituted 100 percent of the purchase price for my machines. * * * Q Now, during the seven year term, initial term of your lease with Copylease and any successor, did you make any inquiries to find out where your equipment was, who it was on lease to, what its status was, whether the maintenance was being maintained? A I never got called on my promissory note, so I assumed it was on lease, and I had no financial interest in the equipment until after December 31, 1987. I made inquiry after December 31, 1987. [Emphasis supplied.] We are not unaware that petitioner, as lessor, had no right to interfere with Copylease's possession of the property. Nonetheless, petitioner's utter indifference to protecting his interests is evidence of an absence of equity in the property. In light of our conclusion that sales did not occur for tax purposes, petitioner did not invest and had no basis in the equipment. Petitioner thus recognized no rental income and was entitled to no offsetting deductions or investment credits [2] in connection with the equipment leasing activity. *65 We also conclude that respondent properly disallowed petitioners' interest deductions. It is well settled that for interest to be deductible under section 163(a), the underlying indebtedness must be genuine. Knetsch v. United States,364 U.S. 361 (1960). A taxpayer's obligation may constitute genuine indebtedness even where the underlying transactions are without substance, so long as the obligor is bound under traditional commercial law concepts. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 95-96 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Rose v. Commissioner,88 T.C. 386, 423 (1987), on appeal (6th Cir., Dec. 14, 1987). Petitioners generally argue that the notes are valid, legally enforceable recourse obligations, facially and substantively. Petitioners contend that a determination that an obligation constitutes genuine indebtedness "requires only a finding that the creditor could enforce the obligation and that the debtor could be called upon to pay off the note." Our determination *66 turns not merely on whether the notes could be enforced, which would elevate form over substance, but whether the notes were intended to be enforced. Petitioner's notes were nonnegotiable; his debt service and Copylease's lease payments were exactly offsetting for the duration of the notes and leases; and he never paid out-of-pocket cash on the note. The transactions were between two related parties. Under these circumstances we must scrutinize the record before determining whether petitioner and Copylease intended the notes to be genuine. The evidence does not support such a determination. There is no evidence that Copylease kept an account for petitioner in which it offset the rent owed to him against the note payments due from him or that Copylease reported the corresponding interest income on its Federal income tax returns. The absence of such evidence is of particular concern because of petitioner's relationship to and position with Copylease. Petitioner's apathy toward whether his lessee was applying the full rent due to his debt service belies his argument. When asked at trial what his current liability was on the outstanding notes on the machines that had been sold, *67 petitioner responded, "In my view, I have no liability left on the notes because the note term is passed." Emphasis supplied. This does not suggest that he was concerned with whether the notes were actually paid off. Furthermore, Getzler testified that petitioner could make a profit on the Xerox transaction because petitioner "only put up a few thousand dollars, whatever it was, $ 9,000"; this viewpoint suggests that Copylease did not consider the notes genuine. 2. Income Averaging
Respondent disallowed petitioners' use of income averaging because they failed to establish their taxable income for each base period year, specifically 1977 through 1979. Petitioners, on the other hand, assert that their returns for these years were filed with the Internal Revenue Service and are not currently under audit; when this Court determines the substantive issues of this case with respect to 1980 and 1981, the taxable income for each base period year will be ascertainable; and the issue will properly be the subject of a Rule 155 computation. Petitioners did not raise this claim in their trial memorandum, at trial, or in their opening brief. After they received respondent's posttrial *68 brief, which pointed out their failure of proof, they moved to reopen the record for receipt of copies of certain returns and other belated documents. Their motion was denied. A Rule 155 computation must be based on evidence within the trial record. See Molasky v. Commissioner,91 T.C. 683, 685 (1988); Cloes v. Commissioner,79 T.C. 933 (1982). In any event, the returns do not prove taxable income. If they had been offered at trial, respondent would have had an opportunity and incentive to stipulate to the taxable income shown or to challenge the reliability of the returns by questioning petitioner about particular items on them. Petitioners did not present at trial any probative evidence of their 1977, 1978, or 1979 taxable income. Without such evidence, their right to income averaging has not been established and cannot be sustained. Unfortunately, the stipulation process did not work well in this case, and the level of cooperation between the parties left a great deal to be desired. During a dispute at the beginning of trial over whether documents *69 received from Copystatistics should be stipulated to or received in evidence, petitioner's trial counsel indicated that he did not "see why I should be held to the burden of their own preparation." Petitioners are now disadvantaged by their own omission of preparation. While respondent might have stipulated to the taxable income for earlier years and to petitioners' right to income averaging, he opposed the motion to reopen the record for persuasive reasons in this case. Under the circumstances, reopening the record would be unfair and unduly inconvenient and cannot be justified. 3. Additions to Tax and Additional Interest
Petitioners preface their objections to the additions to tax and additional interest determined by respondent by asserting that because the deficiencies must be rejected, the additions to tax must be rejected. They offer no further discussion of the additional interest in issue under section 6621(c). Ignoring the technical distinctions among the additions to tax, petitioners argue that none should be imposed because there was substantial authority for the positions taken on their tax returns and the equipment leasing transactions were adequately disclosed *70 on the returns. Under the same general rationale, petitioners assert, without explanation, that it was an abuse of discretion by the Secretary of the Treasury not to waive the additions to tax for valuation overstatements under section 6659, as permitted by section 6659(e). As a term of art, "substantial authority" is used only in relation to additions to tax for substantial underpayments prescribed by section 6661; however, if a taxpayer had substantial authority for the reported tax treatment of a transaction, a fortiori, an addition to tax for negligence under section 6653(a) normally would not be appropriate. Waiver under section 6659(e), however, depends on factual findings that there was a reasonable basis for the valuation or adjusted basis claimed on a return and that such claim was made in good faith. To the extent that substantial authority is a question here, we conclude that petitioners have not satisfied the applicable standard, i.e., a comparison of the weight of authorities in support of the taxpayers' position in relation to the weight of authorities supporting contrary *71 positions. Section 1.6661-3(b)(1), Income Tax Regs. In deciding that petitioners were not entitled to the deductions and investment tax credits claimed in this case, we analyzed prior cases and determined that the facts of this case were more like those in which taxpayers did not prevail. This case is thus materially distinguishable on its facts from cases in which the taxpayer prevailed. See Antonides v. Commissioner,91 T.C. 686, 702-704 (1988); Schirmer v. Commissioner,89 T.C. 277, 285-286 (1987). Moreover, reduction of the addition to tax under section 6661(b)(2)(B)(ii), dealing with adequate disclosure of items on a tax return, does not apply if the arrangements in issue are tax shelters as defined in section 6661(b)(2)(C)(ii). In view of our conclusion that petitioner could not have profited economically from his equipment leasing transactions, the apparent principal purpose of the arrangements was the avoidance of Federal income tax. Thus, to reduce the addition to tax applicable under section 6661(a), petitioner must show that he had substantial authority as required by section 6661(b)(2)(B)(i) and believed *72 that the tax treatment of his equipment leasing transactions "was more likely than not the proper treatment." There is no direct evidence satisfying the above requirement as to petitioner's belief. Factually, however, the evidence suggests that he did not believe that the tax treatment he adopted was more likely than not the proper treatment; that he did not have a reasonable basis for the deductions and credits claimed on the returns; and that he was negligent in failing to make realistic projections of the useful life and residual value of the equipment before making assertions as to those items on his returns. Petitioner at all relevant times was a knowledgeable attorney with extensive experience in lease transactions. Yet in the transactions in issue, he made the "downpayments," claimed the deductions, and thereafter ignored the status of the property and his putative obligations under the notes. We are not persuaded that he is entitled to relief from any of the additions to tax to the extent that such relief depends on legal precedents or his state of mind. As a matter of law, however, the amounts of the additions to tax under sections 6659 and 6661 are interrelated and *73 determined by different effective dates and attribution of different portions of the underpayments. Section 6661(b)(3), applicable to 1982, i.e., returns due after December 31, 1982, provides that: (3) Coordination with penalty imposed by section 6659. -- For purposes of determining the amount of the addition to tax assessed under subsection (a), there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659 (relating to addition to tax in the case of valuation overstatements). Section 6659 applies in this case to the portion of any underpayment for 1982 (and for 1981) that is attributable to a valuation overstatement claimed on petitioner's returns. We have determined that there was no sale of equipment to petitioner for tax purposes; his basis in the equipment in question, therefore, is zero. To the extent that he claimed basis on his return, there is a valuation overstatement, and investment tax credits and depreciation deductions dependent on claims of basis are attributable to that valuation overstatement. *74 Zirker v. Commissioner,87 T.C. 970, 979 (1986). The portion of the underpayment for 1982 attributable to any other items is subject to section 6661(a). The amount that is attributable to the valuation overstatement is also the amount to which additional interest under section 6621(c) applies. Petitioners make two other arguments that have no merit. First, petitioners argue that respondent has "failed to make out a prima facie case" for application of section 6653(a). Petitioners, however, have the burden of proving that respondent's determination of the additions to tax is erroneous. Neely v. Commissioner,85 T.C. 934, 947-948 (1985). Second, in their reply brief, petitioners argue that "In the event that this Court determines that the deductions should be disallowed on one of the alternative grounds set forth in Respondent's notice of deficiency" no addition to tax is appropriate under section 6659 in view of Todd v. Commissioner,89 T.C. 912 (1987), on appeal (5th Cir., Jan. 26, 1988). Petitioners are not entitled to rely on *75 Todd. There the taxpayers had a basis in the property in issue, but they were not entitled to depreciation or investment tax credit in the year before the Court because that property had not been placed in service in that year. It was not necessary to determine either the correct amount of basis or the fair market value of the property. Here, the ground for decision is that petitioners acquired no basis in the equipment in question. Thus, we have determined a valuation overstatement and have not disallowed the deductions and credits for any alternative reason. The addition to tax under section 6659 is appropriate in 1981 and 1982. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. "Erosion rate" is "the rate at which equipment loses value because of technological changes in the market place." ** "Percent good" is "the percentage of the list price for which that equipment eventually sold."
* Respondent determined this addition pursuant to sec. 6653(a). ** 10 percent of the understatement of $ 12,928. *** 10 percent of the understatement of $ 15,313. **** 120 percent of the interest accruing after December 31, 1984, for the tax resulting from any substantial underpayment of tax attributable to tax-motivated transactions. Respondent determined the entire deficiency for each year to be such an underpayment of tax.↩
2. Respondent alternatively disallowed the investment credits because petitioner, as a noncorporate lessor, did not satisfy section 46(e)(3). Petitioners concede this point on brief.↩