DENNIS A. PRYOR AND WILMA S. PRYOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pryor v. Commissioner
Docket No. 31571-87
United States Tax Court
T.C. Memo 1991-109; 1991 Tax Ct. Memo LEXIS 133; 61 T.C.M. (CCH) 2139; T.C.M. (RIA) 91109; March 14, 1991, Filed *133 Decision will be entered under Rule 155. Gary S. Cook, B. Roland Freasier, Jr., Allan M. Heyward, Jr., and Henry M. Massie, Jr., for the petitioners. John C. McDougal, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows: Additions to Tax Year
Deficiency
[1] Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661(a)
1983
$ 37,715
$ 1,886  50 percent of
$ 9,429 the interest
due on $ 37,715
1984
41,300
2,065
50 percent of
10,325
the interest
due on $ 41,300
1985
34,037
1,702
50 percent of
8,509 the interest
due on $ 34,037
The issues for decision are: (1) Whether petitioners' yacht chartering activity *134 was an activity engaged in for profit, within the meaning of section 183(a); (2) whether petitioners must recapture in 1983 an investment tax credit claimed in 1982 upon the acquisition of a 41-foot Bristol sailboat; (3) whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2); and (4) whether petitioners are liable for additions to tax for substantial understatement of income tax under section 6661(a). FINDINGS OF FACT
Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Dennis A. Pryor and Wilma S. Pryor are husband and wife who resided in Deltaville, Virginia, at the time they filed their petition in this case. Petitioners timely filed joint Federal income tax returns for taxable years 1982 through 1985 with the Internal Revenue Service Center in Memphis, Tennessee. During the years 1982 through 1985, petitioners' principal source of income was the salary earned by Dennis A. Pryor (petitioner) from Medical Management Services, Inc. (MMS), of which petitioner was a 50-percent *135 owner. Petitioner and the other 50-percent owner formed MMS approximately 10 years ago and have developed it into a multi-million dollar business. Petitioner drew salaries from MMS in the respective amounts of $ 286,759 in 1982, $ 310,599 in 1983, $ 435,895 in 1984, and $ 451,708 in 1985. Petitioner has over 20 years sailing experience and has owned several sailboats over the course of his lifetime. During either 1976 or 1977, petitioner purchased a 32-foot Columbia sailboat from Rappahannock Yachts, Inc. (RYI). Petitioner purchased the Columbia sailboat for approximately $ 39,000. The Columbia sailboat was used for petitioners' personal recreation. In 1983, petitioner also owned two power boats, a 32-foot Trojan and an 18-foot Wellcraft, which he used for personal purposes. These power boats were maintained near petitioners' residence in Deltaville, Virginia. Because of the time requirements of his employment by MMS, petitioner's recreational boating activities during the years in issue were primarily confined to use of his power boats. RYI engages in yacht sales, service, and chartering, and is located across the Rappahannock River from Deltaville, in Irvington, Virginia *136 -- approximately a 35-minute drive from petitioners' residence. The Rappahannock River flows into the Chesapeake Bay. During February 1982, petitioner and his wife went to RYI to check on their 32-foot Columbia sailboat. At the boatyard, petitioners noticed a new 41-foot Bristol sailboat which was up on blocks. RYI had recently purchased the Bristol as inventory for subsequent resale. Petitioner subsequently contacted Bruce Sanders, the owner of RYI, about the Bristol. After ascertaining the purchase price and considering the limited amount of time available to him for recreational purposes, petitioner determined that the Bristol was too expensive to purchase for his personal use. Mr. Sanders then informed petitioner that the Bristol would be a good boat to purchase and place into RYI's charter fleet, and that he thought RYI could obtain ten weeks of charter annually for the Bristol at a rate of $ 1,250 per week. [2] Mr. Sanders also provided petitioner with estimated figures on dockage, insurance, routine maintenance, and management fees. *137 When petitioner purchased the Bristol, it was the largest and most expensive sailboat placed into the RYI charter fleet at the time. The Bristol had a tricabin outlay consisting of a fore, mid, and aft cabin. In the fore and aft cabins were private staterooms, and in the mid cabin was the galley. When the Bristol was placed into the RYI charter fleet, it was the only sailboat with a tricabin outlay. Based on conversations with Mr. Sanders and his own experience, petitioner believed that the Bristol would occupy a unique place in chartering activity in the Irvington area. In addition to the annual number of charters that RYI could provide, petitioner believed that he could obtain additional charters for the Bristol from MMS. Petitioner believed that the key to making his sailboat chartering activity profitable was the additional charters he expected to obtain through MMS. Petitioner thought that the Bristol would be particularly well suited to MMS' charters because MMS charters would include doctors who he believed were used to and expected first-class accommodations. Using the information provided to him by Mr. Sanders, petitioner made a written 12-year projection of his *138 estimated expenses and revenues from chartering the Bristol. Petitioner's projection was from the years 1982 through 1993. In his projection, petitioner estimated revenues from both MMS charters and RYI charters. Petitioner estimated that he would receive approximately 10 weeks of charters from RYI, and that he would receive approximately 5 weeks of additional charters from MMS per year. During the earlier years of operation, the charter revenue estimates were based upon a weekly charter rate of $ 1,250 per week. Thereafter, the charter rate was increased along with projected expenses, in order to account for inflation. The charter season in the Irvington area is generally from April through October of each year. Since petitioner's projection assumed the Bristol would be chartered for only 50 percent of the sailing season, petitioner believed that his projection was conservative and thought that it was likely that additional annual charters could be obtained. This was based in part on his belief that the Irvington area would become more popular as it was discovered by boating enthusiasts. Petitioner's projection indicated losses in the earlier years and profits in later years, *139 and reflected a net operating profit over a 12-year period in the amount of $ 313. The losses projected in the earlier years were primarily due to depreciation. [3] In addition, petitioner estimated that the value of the Bristol in 1993 would be $ 200,000 and that this value would represent a profit since estimated operating revenues would have provided funds for the Bristol's cost. Petitioner's expectation that the Bristol would likely increase in value was based upon advice from Mr. Sanders and petitioner's own experience. Petitioner also consulted Martin L. Brill, a certified public accountant at MMS, who also made a written projection of the Bristol's anticipated operating revenues and expenses. In a memorandum, dated March 15, 1982, Mr. Brill projected, over a 15-year period, that the Bristol charter operation would produce a net operating profit of $ 63,951. In his memorandum, Mr. Brill concluded *140 that, "a sailboat charter operation could be profitable over an extended time period of say 12-15 years." In addition to his projection, Mr. Brill advised petitioner to maintain meticulous records of the boat's use, separate bank accounts, and separate accounting records, which he did. Petitioner subsequently purchased the Bristol sailboat for $ 135,000. The purchase was consummated on April 2, 1982, when petitioner took delivery of the sailboat. Petitioner paid for the Bristol sailboat with a $ 1,000 down payment, a trade-in of his 32-foot Columbia sailboat for $ 35,000, and a $ 99,000 note secured by a mortgage on the Bristol. [4] During the month of April 1982, the Bristol was equipped and outfitted by RYI. The total cost of the Bristol, including additions and improvements made and equipment purchased in 1982, was $ 152,756. *141 Petitioner operated his chartering activity as a proprietorship named "DAP Charters" which he formed in mid-March of 1982. He turned the management of the Bristol sailboat over to RYI, which became his agent for the charter and management of the sailboat. In exchange for its management services, RYI was to receive 35 percent of gross charter revenues. RYI was also responsible for all routine maintenance and repair work on the Bristol, the cost of which was charged to petitioner. The first charter of the Bristol was in May of 1982. Because the Bristol was not placed into RYI's charter fleet until after the 1982 charter season had begun, it was not included in any of RYI's promotions for that year. [5]
During September 1983, the Bristol's motor began overheating. It was later determined that *142 the overheating problem was attributable to a manufacturer's design defect. The overheating problem continued throughout 1984. Repairs were performed on the motor between charters during May and June of 1984. Repairs were also performed during February 1984. In addition, the Bristol was unavailable for charter from mid-July 1984 through early August 1984, and for part of September because of repairs being performed on its motor. In April 1985, the engine head was replaced. The overheating problem, however, continued and, in May 1985, the engine head was replaced for a second time. In July 1985, the overheating problem was finally solved when RYI designed and installed a modified cooling system. During 1984, the Bristol's windows began to leak. This was because the size of the window holes were improperly cut by the manufacturer. As a result, water seeped inside of the Bristol and damaged the finish of its teak interior. To repair the problem, the Bristol's windows were removed, the edges of the window holes were refiberglassed, and the windows were reinstalled. As a result of this leakage, it was necessary to refinish the teak interior of the Bristol. These repairs were *143 authorized by the manufacturer, and were performed on the Bristol from April 17 through May 10, 1984. The Bristol was chartered for only one day (April 21, 1984) during the time these repairs were performed. During 1982, the Bristol was available for charter from May 1 through October 31 at a weekly rate of $ 1,150 per week, [6] $ 600 per weekend, $ 720 per 3-day charter or $ 830 per 4-day charter. In 1983, the weekly rate was reduced to $ 1,050 in an attempt to obtain more charters. Petitioner was attempting to attract charterers from the Washington, D.C. area. The Bristol was generally available from March 1 through October 31 of 1984 and 1985 at these rates, except for periods during which it was down for repairs. The Bristol's use from 1982 through 1985, broken down into the number of days that the Bristol was chartered by MMS, the number of days that the Bristol was chartered by other charterers, and the number of days that petitioner personally used the Bristol is as follows: Year
MMS Charters Non-MMS Charters Petitioner 1982
11 days
36 days
3 days 1983
28 days
40 days
10 days
1984
24 days
38 days
7 days 1985
0 days 54 days
7 days *144 In early 1983, petitioner contacted Mr. Sanders several times in an effort to get more charters from RYI. Petitioner also inquired about relocating the Bristol to another marina where it could obtain more charters. Petitioner did not relocate the Bristol, however, because he believed that the Irvington area was going to increase in popularity. The interior of the Bristol contained teakwood cabinetry, and the exterior of the Bristol was furnished with teakwood trim. Teakwood is expensive to maintain, and this extra expense was not anticipated or accounted for by petitioner in his 12-year projection. During 1984 and 1985, petitioner incurred substantial expenses for maintenance of the Bristol's teakwood. On several occasions, petitioner urged Mr. Sanders to keep the Bristol's maintenance costs down. Petitioner had originally intended that when MMS would charter the Bristol, several doctors from a single group practice would be included in each charter. [7] However, due to hospital scheduling priorities, generally only one doctor from a group was able to go sailing on an MMS charter. As a result, it became too expensive for MMS to charter the Bristol for only one doctor. Petitioner *145 also observed that doctors who were taken on charter trips on the Bristol were impressed by the quality of the accommodations, but, as a result, started to question whether they were paying excessive fees to MMS. For these reasons, the MMS charters were discontinued in 1985. RYI maintained records of all expenses and paying charters and provided those records to petitioner on a monthly basis. Petitioner's accountant prepared schedules of the charters from the records. During 1982 through 1985, the income and expenses for the charter operation of the Bristol were as follows: 1982
1983
1984
1985
Income
$ 8,947 $ 12,535 $ 10,920 $ 10,709 Expenses:
Interest  (9,566) (10,437)
(9,211) (6,376) Taxes  --   (928)   (1,024) (942)   Depreciation  (21,538)
(33,600)
(28,825)
(32,280)
Other:
Cleaning & Maintenance  (1,623) (6,483) (7,267) --   Commissions  (1,230) (2,508) (3,764) (3,538) Insurance  (1,113) (961)   (990)   (1,046) Supplies  (2,469) (17)    (552)   (642)   Fuel  (74)    --  (73)    (261)   Dockage  (512)   (701)   (798)   (872)   *146 1982
1983
1984
1985
Other:
Advertising  --   (138) --   --    Repairs  --   (1,901)
(1,578)   (7,405)   Miscellaneous  --   --   (22)      (32)      Net Loss
($ 29,178)
($ 45,139)
($ 43,184)
($ 42,685)
On their 1982 return, petitioner claimed an investment credit in the amount of $ 15,276 with respect to the Bristol. On July 1, 1984, petitioner purchased a 39-foot Beneteau sailboat from "The Moorings, Ltd." (Moorings) in the British Virgin Islands at a total cost of $ 124,280. During the years 1984 and 1985, the Beneteau was docked in and chartered out of the Virgin Islands. Petitioner entered into a charter agreement with Moorings, in which Moorings agreed to berth, operate, maintain and manage the yacht for a commission fee. Moorings was authorized to make whatever ordinary repairs and replacements it deemed necessary to the yacht and to maintain the yacht in charterable condition at petitioner's expense. One of the reasons that petitioner selected the Beneteau was that it was smaller than the Bristol, and did not have much teakwood that would require costly maintenance. Petitioner had visited Moorings several times before he *147 decided to purchase the Beneteau. Prior to purchasing the Beneteau, petitioner received and examined estimates of income and expenses that were provided to him from Moorings. Moorings also provided petitioner with figures on its past experience as to the average number of charters per year. These figures showed that, over a 6-year period ending December 31, 1983, Moorings had obtained an average of 33 to 35 weeks of charter per year for boats between 37 and 50 feet in length. These past charter figures were supported by a statement from the certified public accounting firm of Peat, Marwick, Mitchell & Co. One of the reasons petitioner chose Moorings was that the charter activity in the Virgin Islands was year round. Petitioner estimated that Moorings would be able to charter the Beneteau for at least 35 weeks per year. In its estimate of income and expense, Moorings projected an annual positive cash flow of $ 14,589 based upon 35 weeks of charter per year. This projection did not reflect depreciation or interest payments. Petitioner financed a portion of the purchase price of the Beneteau over 15 years. The amount of the purchase price of the Beneteau that petitioner financed *148 is not in the record. Petitioner's monthly payment, including both principal and interest, was $ 1,204. Based upon this monthly payment and Moorings estimate of other expenses and charter income, petitioner estimated that he could generate a positive cash flow. Petitioner also believed that the Beneteau would appreciate in value. Petitioner believed, based on these estimates, that he could make a profit. During 1984 and 1985, the Beneteau was chartered 85 days and 203 days, respectively. Petitioner made no personal use of the Beneteau in 1984. During 1985, petitioner personally used the Beneteau for only 5 days. Petitioner received and incurred the following income and expenses with respect to the charter operation of the Beneteau in 1984 and 1985: 1984
1985
Income
$ 19,333 $ 49,023 Expenses:
Interest  (5,599)   (12,466)  Taxes  --   --   [8] Depreciation   (17,710)  (25,351)  Other: Repairs  (1,102)   (2,966)   Commissions  (3,662)   (9,302)   Insurance  (698)     (1,361)   Dockage  (1,500)   (2,928)   Miscellaneous  (396)   --   Operating Expense  (7,733)   (19,138)  Auto & Travel  --   (900)     Net Loss
($ 19,067) ($ 25,389)
*149 On the 1984 return, petitioner claimed an investment credit with respect to the Beneteau in the amount of $ 12,428. The parties agree that this credit was not allowable because the Beneteau was never used in United States commerce. OPINION Section 183(a) provides that a taxpayer cannot claim a deduction for an activity which is "not engaged in for profit," except as provided for under section 183(b). An activity not engaged in for profit is any activity in which deductions would not be allowed for the taxable year under section 162, or under paragraphs (1) or (2) of section 212. Sec. 183(c). Section 162 allows a taxpayer to claim a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 212 generally allows a taxpayer to claim a deduction for all the ordinary and necessary expenses paid or incurred during the *150 taxable year "for the production or collection of income," and "for the management, conservation, or maintenance of property held for the production of income." For a deduction to be allowable under either section 162 or 212, the taxpayer must show that the activity in which the expenses were incurred was engaged in with an "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is unnecessary, a taxpayer's profit objective must be bona fide. Elliott v. Commissioner, 90 T.C. 960, 970 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); Taube v. Commissioner, 88 T.C. 464, 478-479 (1987); Dreicer v. Commissioner, supra at 645. This is a factual issue which is to be resolved after considering all the relevant facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Finoli v. Commissioner, 86 T.C. 697, 722 (1986). In making this determination, more weight is *151 given to objective facts than a taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). Petitioners bear the burden of establishing the requisite profit objective. Beck v. Commissioner, 85 T.C. 557, 569-570 (1985); Rule 142(a). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine objective factors for determining whether an activity is engaged in for profit. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. Not all of these factors are applicable *152 in every case and no one factor is controlling. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v. Commissioner, 72 T.C. 28, 33-34 (1979). We begin by examining the manner in which petitioner carried on his sailboat chartering activity. The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records, may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. Respondent does not challenge the amount of petitioner's claimed deductions with respect to his sailboat chartering activity, and concedes that petitioner's books and records were adequately maintained. Petitioner's maintenance of a separate bank account and separate records is evidence that he carried on his sailboat chartering activity with the requisite profit objective. A study performed prior to entering into an activity may also be an indication that the activity was engaged in for profit. We find significant the fact that, prior to purchasing the Bristol, petitioner made a written 12-year projection of anticipated revenues and expenses from chartering the *153 Bristol. Petitioner believed that his projection was conservative because he expected that the Irvington area, where the Bristol was located, would become more popular as more people discovered its advantages. Petitioner's 12-year projection essentially represents a cash flow analysis if the projected depreciation is viewed as accounting for the payment of the Bristol's purchase price. Petitioner's projection fully depreciates the cost of the Bristol over a 5-year period. The projection also shows that petitioner intended to repay the note used to finance the sailboat over 5 years. The first 5 years of petitioner's projection reflects a loss of $ 136,624 which is due primarily to depreciation. Over the remaining 7 years, however, petitioner projected net income in the amount of $ 136,937. Petitioner's 12-year projection indicated that petitioner would make an overall operating profit of $ 313 from chartering the Bristol. He compared his projection with that drawn up by his accountant, Martin Brill, which assumed a greater number of charters during the sailing season, and projected an overall operating profit of over $ 60,000. In addition to the operating profit to be derived *154 from the charter revenues, petitioner also expected to profit from the value of the Bristol at the end of this 12-year period which he estimated would be approximately $ 200,000. The expectation that assets used in the activity may appreciate in value is another factor to be considered in deciding whether an activity was engaged in for profit. Sec. 1.183-2(b)(4), Income Tax Regs. A taxpayer may intend to derive a profit from the operation of the activity, and may also intend that even if little or no operating profit is derived, an overall profit will result when appreciation in the value of the asset used in the activity is realized, since income from the activity together with the appreciation of the asset will exceed the costs and expenses of operation. Sec. 1.183-2(b)(4), Income Tax Regs. We will consider petitioner's use of the Bristol for charter and holding the Bristol for appreciation to be a single activity within the meaning of section 183. Antonides v. Commissioner, 91 T.C. 686, 695 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Petitioner believed that he would make a profit as a result of chartering the Bristol and would also realize *155 an increase in the value of the sailboat at the end of the 12-year period. Petitioner estimated that the Bristol would be worth $ 200,000 at the end of this 12-year period. At the time petitioner purchased the Bristol, the prices of sailboats had been escalating. [7]
Petitioner's profit objective in acquiring the Beneteau was based upon a similar analysis. However, in the case of the Beneteau, petitioner relied heavily upon the projections by Moorings and then factored in his monthly financing payments (principal and interest) in estimating the cash flow generated by the operation. Based on his *156 analysis, there would be sufficient revenues to meet operational expenses and monthly payments. Petitioner believed that the unlimited sailing season in the Virgin Islands would result in much greater charter revenues than could be realized in the Irvington area. Petitioner believed that at the end of 15 years, he would own the boat, that it would have appreciated in value, and that it would have been paid for out of charter revenues. Respondent argues that petitioner did not have a real expectation that the value of the sailboats would appreciate in value. We have found, however, that petitioner believed that the sailboats would appreciate. In any event, petitioner believed that he would recoup the cost of the sailboats over the term of his charter projections and, thus, would own valuable assets at the end of the projected periods. We note that even if the sailboats had not appreciated, the residual value of assets used in an activity is a factor to be considered in deciding whether an activity is engaged in for profit. See Levy v. Commissioner, 91 T.C. 838, 873 (1988); Torres v. Commissioner, 88 T.C. 702, 729 (1987). Thus, in the *157 instant case, even if the value of the sailboats decreased over the projected charter period, petitioner would have made an overall profit from his sailboat chartering activity so long as the residual value of the sailboats was substantial and his revenue and operating expense estimates were accurate. Regarding the Bristol, respondent argues that petitioner did not engage in his sailboat chartering activity with the requisite profit objective because he failed to take reasonable steps to increase charter revenues. The evidence in the record shows, however, that after the first year of operation, petitioner attempted to improve profitability. During January 1983, petitioner wrote letters to Mr. Sanders stating that RYI needed to obtain additional charters. Attached to one of the letters was a copy of his 12-year projection. In the other letter that petitioner wrote to Mr. Sanders, petitioner expressed his dissatisfaction with RYI's performance during the 1982 charter season, and stated that he needed at least 10 weeks of chartering from RYI during 1983. On other occasions, petitioner urged Mr. Sanders to keep maintenance costs down. Respondent also argues that petitioner made *158 no serious attempts to relocate the Bristol to a busier area where it might be able to obtain more charters. The evidence in the record indicates that petitioner inquired at other marinas about the possibility of relocating the Bristol. Petitioner testified, however, that he did not relocate the Bristol to another area to improve profitability, because he believed that the Irvington area had great potential. Also, if the Bristol had been relocated to a different area, petitioner would have lost the revenues from the MMS charters, which petitioner testified was the key to making the sailboat chartering activity profitable. Petitioner did not devote a significant amount of his personal time and effort to his sailboat chartering activity. However, the fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit objective when the taxpayer employs competent and qualified persons to carry on such activity. Sec. 1.183-2(b)(3), Income Tax Regs. The Bristol's charters were managed by RYI, and the Beneteau's charters were managed by Moorings. Both RYI and Moorings appear to be competent and qualified at chartering sailboats. *159 Thus, we do not weigh against petitioner the fact that he did not devote a significant amount of time and effort to his sailboat chartering activity. History of losses with respect to the activity is another factor to be considered. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioner reported losses from his sailboat chartering activity for each of the taxable years in issue and in 1982. However, a series of losses during the start-up stage will not necessarily be deemed indicative that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioner's losses during the years in issue are, to a great extent, attributable to large, up-front, depreciation deductions he claimed with respect to the Bristol and Beneteau. [8]
Unexpected losses due to fortuitous circumstances which are beyond the taxpayer's control, would not be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), *160 Income Tax Regs. During September 1983 and until July 1985, Bristol's motor had an overheating problem. Repairs were performed several times on the Bristol, including replacement of the engine head two times, and installation of a newly designed cooling system. The Bristol was also unavailable for charter during the period of time that its windows were being repaired. A portion of petitioner's losses are attributable to the unanticipated expenses of these repairs. The Bristol was also unavailable for charter while it was being repaired. Therefore, the charter revenues which petitioner anticipated did not materialize. The financial status of the taxpayer is another factor to be considered. Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from outside sources, showing the lack of need to make a profit from the activity may indicate a lack of profit objective. Sec. 1.183-2(b)(8), Income Tax Regs. During the years in issue, petitioner earned substantial income from MMS. However, we find this factor to be outweighed by the other factors considered. The presence of recreational elements in the activity may be an indication that the activity was not engaged in with a *161 profit objective. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioner has over 20 years of sailing experience and clearly enjoys sailing. We are convinced, however, that the personal pleasure of owning and using the Bristol and Beneteau were secondary to owning and chartering the sailboats for profit. During the years in issue, petitioner's personal use of the Bristol and Beneteau was very limited. Petitioner used the Bristol for personal purposes for only 3 days in 1982, 10 days in 1983, 7 days in 1984, and 7 days in 1985. Petitioner's personal use of the Beneteau was limited to only 5 days during the years in issue. We do not believe that petitioner's limited personal use of the Bristol and the Beneteau is sufficient to classify petitioner's sailboat chartering activity as one not engaged in for profit. See Dickson v. Commissioner, T.C. Memo 1983-723; McLarney v. Commissioner, T.C. Memo 1982-461. We hold that petitioner has met his burden of proving that his sailboat chartering activity was engaged in with an actual and honest objective of making a profit. The next issue for decision is whether petitioner must recapture in 1983 an investment *162 tax credit, in the amount of $ 15,276, claimed in 1982 upon the acquisition of the Bristol. Respondent concedes on brief that when the notice of deficiency was issued, the period of limitations with respect to petitioner's 1982 taxable year had expired. In the notice of deficiency respondent "disallowed" petitioners' claimed 1982 investment tax credit and included the amount as part of petitioner's tax liability for taxable year 1983. [9] Respondent states his position on brief as follows: "It is only in the event that the Court finds the activity was engaged in for profit in 1982, but not in 1983, that the credit should be recaptured." Thus, our determination that petitioner's sailboat chartering activity was engaged in with the requisite profit objective is dispositive of this issue. Accordingly, we hold for petitioners on this issue. *163 The final issues for decision are the additions to tax. Respondent determined additions to tax for negligence under section 6653(a)(1) and (2), and additions to tax for substantial understatement of income tax under section 6661(a). The additions to tax were both based upon respondent's disallowance of petitioner's losses from his sailboat chartering activity. Accordingly, we find for petitioners on these issues. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Mr. Sanders' estimate that the Bristol could be chartered for $ 1,250 per week was based upon his past experience in chartering smaller boats.↩
3. Depreciation was based on a 5-year useful life. Respondent has not questioned petitioner's method of depreciation.↩
4. The interest rate and term of petitioner's note is not in evidence. However, petitioner testified, and his 12-year projection reflects, that he intended to repay the note over a 5-year period.↩
5. RYI promotes its chartering business by distributing promotional materials at boat shows which occur during the January and February months. In addition, RYI mails a listing of all of its boats to its past charterers.↩
6. The record does not reveal why this weekly rate was less than the $ 1,250 that Mr. Sanders told petitioner that the Bristol could be chartered for. On the other hand, it is unclear whether petitioner's estimate of revenues per week factored in the higher per day rate for charter of less than a full week.↩
7. For business reasons, MMS did not charter the Bristol for doctors from different group practices.↩
8. Depreciation was based on a 5-year useful life. Respondent has not questioned petitioner's method of depreciation.↩
7. For other cases which contain similar findings regarding appreciation during this general period, see Antonides v. Commissioner, 91 T.C. 686 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Van Scovoc v. Commissioner, T.C. Memo 1988-520; Feldman v. Commissioner, T.C. Memo 1988-126; Dickson v. Commissioner, T.C. Memo 1983-723↩.
8. As previously noted, respondent does not question petitioner's method of depreciation.↩
9. In the explanation of adjustments, attached to the notice of deficiency, respondent stated his reason for disallowing petitioners' claimed 1982 investment tax credit as follows: "The $ 15,276.00 shown as an investment credit on the Bristol sailing yacht is disallowed because the property does not qualify for the investment credit under section 38 of the Internal Revenue Code↩. Therefore, your tax is increased $ 15,276.00 for 1983."